### In re GGSI LIQUIDATION INC., et al., Debtors.

**Gus A. Paloian, not individually but solely in his capacity as the Chapter 7 trustee of the Above captioned bankruptcy estates, Plaintiff,**

**v.**

**Grupo Serla S.A. de C.V. a/k/a Grupo Empresarial Serla, S.A. de C.V.; Editorial Comercial, S.A. de C.V.; Sergio Eduardo Guarneros Trujillo; Bank One individually and as successor-in-interest to First National Bank of Chicago, a national banking, association, and Union Industrial Mexicana, S.A. de C.V., Defendants.**

**Bankruptcy No. 01 B 31751. Adversary No. 03 A 03888.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Sept. 7, 2006.

534

536

Mark A. McDermott, Skadden, Arps, Slate, McAgher and Flo, Chicago, IL, for Debtors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JACK B. SCHMETTERER, Bankruptcy Judge.

Following trial, the following Findings of Fact and Conclusions of Law are made and to be entered:

### FINDINGS OF FACT

#### The Parties

##### The Plaintiff

1. Goss Graphic Systems, Inc., n/k/a GGSI Liquidation, Inc. ("Debtor" or "Goss") manufactured and sold offset printing press systems, among other things, for the newspaper, advertising, and commercial printing markets. It filed under Chapter 11 of the Bankruptcy Code, an action later converted to Chapter 7.

2. Plaintiff Gus A. Paloian (the "Trustee" or "Plaintiff") is the Chapter 7 Trustee of the Bankruptcy Estate of Goss and was appointed as such on or about February 27, 2002.

3. Plaintiff sued as Chapter 7 Trustee by filing this Adversary Complaint against Grupo Serla SA de C.V. ("Grupo Serla"), Editorial Comercial ("Editorial Comercial"), Union Industrial Mexicana SA de CV ("Union Industrial"), Sergio Eduardo Guarneros Trujillo ("Guarneros"), and Bank One (the "Bank" or "Bank One").

##### Defendant Sergio Eduardo Guarneros Trujillo ("Guarneros")

4. Guarneros was the General Administrator, or Chief Executive Officer, and President of Editorial Comercial and Grupo Serla at the time the events underlying

this suit took place.[1] Guarneros is a resident of Mexico.

### Defendant Editorial Comercial, S.A. de C.V. ("Editorial Comercial")

5. Editorial Comercial is a business entity organized under the laws of Mexico with its principal place of business in Mexico.

### Defendant Grupo Serla, S.A. de C.V.A. a/k/a Grupo Empresarial Serla, S.A. de C.V. ("Grupo Serla")

6. Grupo Serla is a business entity organized under the laws of Mexico with its principal place of business in Mexico.

### Defendant Union Industrial Mexicana, S.A. de C.V. ("Union Industrial")

7. Union Industrial is a business entity organized under the laws of Mexico. Union Industrial is related to Guarneros and His Companies.

### Defendant Bank One

8. Bank One was a national banking association organized under laws of the United States of America at the time this action was brought. It has since merged into J.P. Morgan Chase Bank, N.A. (Bank One's Answer at ¶ 17.)[2]

### Introduction and Summary

9. This Adversary proceeding relates to the bankruptcy case of Goss Graphic Systems, Inc., n/k/a GGSI Liquidation, Inc. ("Goss" or "Debtor").

10. In 1997, Goss sold a printing press to Editorial Comercial for the purchase price of $5,948,860.00. Grupo Serla and Editorial Comercial executed a promissory note (the "Grupo Serla Note" or the "Note") payable to the order of Goss in the principal sum of $5,370,000.00 for the printing press. Bank One financed the sale by purchasing the Grupo Serla Note from Goss. Bank One extended the financing with Goss' explicit agreement that it would remain secondarily liable on the Grupo Serla Note.

11. After the purchasers failed to pay amounts due under the Grupo Serla Note, Bank One demanded and Goss agreed to repurchase that Note. Subsequently, Goss paid Bank One $5,175,728.17 in connection with the repurchase obligation, a large portion of the total amount due. However, after Goss filed for bankruptcy protection, Bank One (being still in possession of the

---

**1.** Guarneros, when referred to collectively with Grupo Serla and Editorial Comercial, will hereinafter be referred to as "Guarneros and His Companies." Guarneros, Grupo Serla, Editorial Comercial, and Union Industrial, will alternatively be referred to as the "Foreign Defendants."

**2.** That merger apparently brought into play Rule 25(c) Fed.R.Civ.P. [Rule 7025 Fed. R.Bankr.P.] which provides:

(c) Transfer of Interest. In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party.

No party moved that J.P. Morgan Chase Bank N.A. be substituted for Bank One as a party herein, and in the absence of such motion, no order was entered providing for substitution.

Rule 25(c) does not require that anything be done after a "transfer of interest" under that Rule. The actions continued against Bank One and Circuit precedent holds that judgment ordered against the transferor of interest will be binding on its successors even though not named. *Otis Clapp & Son, Inc. v. Filmore Vitamin*, 754 F.2d 738, 743 (7th Cir.1985) citing 7A Wright and Miller, Federal Practice and Procedure § 1958 at 664–65.

The Plaintiff here was evidently satisfied that no substitution was required because facts concerning the merger and any applicable non-bankruptcy law supported the assumption that a judgment can be recovered from Chase if not from Bank One. *See* Vol 6 Moore's Federal Practice 3d ed 2006 § 25–31[2]. If that be so, the merger could be the sort of "transfer" referred to in Rule 25(c). See *Id.*, § 25–31[1].

original Grupo Serla Note) sold and delivered the Note to an entity connected to the makers of the Note and kept all of the sale proceeds. Bank One did this without giving notice to Goss' creditors or seeking modification or relief from the automatic stay. The bankruptcy case was later converted to one under Chapter 7 and the Plaintiff Trustee was appointed.

12. In the Trustee's First Amended Complaint consisting of eight counts, he seeks the following: (Count I) a judgment in favor of Trustee and against Grupo Serla and Editorial Comercial based on their failure to pay the amounts due and owing under the Grupo Serla Note for which payments they are jointly and severally liable; (Count II) a judgment in favor of Trustee and against Guarneros based on his failure to make any payments pursuant to his personal guarantee of the Grupo Serla Note; (Count III) a judgment in favor of Trustee and against Editorial Comercial based on its failure to cure its default under the Sale and Purchase Agreement; (Count IV) a declaratory judgment declaring that Goss is the rightful owner of the Grupo Serla Note; or alternatively, declaring that Goss is the equitable owner of a majority interest in the Grupo Serla Note; (Count V) a constructive trust on any and all proceeds from the sale, assignment, disposition, or collection of the Grupo Serla Note in favor of the Trustee, an order requiring Union Industrial and/or Bank One to execute appropriate documents transferring all right, title, and interest in the Grupo Serla Note to the Trustee, and an order requiring Bank One and Union Industrial to account for any proceeds or other benefits generated by the Grupo Serla Note and to pay at least 80% of such funds to the bankruptcy estate; (Count VI) a rescission of the December 15, 2000 Agreement; (Count VII) a declaration that the transfer of the Grupo Serla Note to Union Industrial is void

under 11 U.S.C. § 549; and (Count VIII) a judgment in favor of the Trustee and against Bank One and Union Industrial in the amount of actual damages incurred as a result of the violation of the automatic stay, including attorney fees, costs, and punitive damages.

13. In response, Bank One argued the following: (1) the Grupo Serla Note belonged to Bank One and was not property of the Goss bankruptcy estate; (2) Bank One protected and preserved Goss' interests when it sold the Grupo Serla Note; (3) Bank One cannot be held to have violated the automatic stay because it acted under a claim of ownership; (4) no interest of the estate was impaired or foreclosed; and (5) even if Bank One violated the automatic stay, the Trustee has failed to establish damages to the Estate.

14. Bank One also asserted the following affirmative defenses: (1) equitable estoppel bars the Trustee's claims; (2) Goss and the Trustee waived any right to pursue claims against Bank One; (3) the Trustee lacks standing to bring for violation of the automatic stay; (4) the Trustee's claims are barred by the doctrine of laches; (5) Goss failed to mitigate any alleged damages; (6) any award is subject to set-off; and (7) Goss ratified the conduct that the Trustee now claims was wrongful.

15. The Trustee seeks a judgment against the Foreign Defendants based on their breach of contract obligations pursuant to the sale and Promissory Note. The Trustee also requests judgment in his favor against Guarneros for all damages available pursuant to applicable law based on his personal guarantee of the Promissory Note.

16. In response, the Foreign Defendants argued: (1) they never accepted the printing press; (2) the printing press did

not meet specifications called for in the Sale and Purchase Agreement; (3) Goss cannot enforce the Promissory Note because Goss does not own or hold it; (4) Goss was already paid by Bank One; and (5) Guarneros and Editorial Comercial are no longer bound by the Promissory Note or any other agreement because of a handwritten settlement agreement between Goss and Grupo Serla.

17. Following trial and with agreement of the parties, final arguments were submitted in writing through filings of proposed Findings of Fact and Conclusions of Law. For reasons stated below and pursuant to separate judgment order to be entered, judgment will be entered in favor of Plaintiff against Bank One for damages based on Bank One's willful violation of the automatic stay. A separate judgment will enter in favor of Plaintiff against Bank One for damages based on Bank One's breach of its duty as a secured party pursuant to § 9–207 of the Uniform Commercial Code as adopted in Illinois, 810 ILCS 5/9–207, and for its transfer of the Goss property interest in the Note during bankruptcy, under 11 U.S.C. § 549. Judgment will also separately enter in favor of Plaintiff and against the Foreign Defendants jointly and severally for breach of contract based on their failure to pay Goss on the Promissory Note given when purchasing the printing press, and against Guarneros for breach of his personal guarantee. Other issues presented will be discussed below.

### Goss Sold A Printing Press

18. In December of 1996, Grupo Serla issued a letter of intent to purchase a Goss Universal 45 printing press from Goss. (Pl.Ex. 1; citations to Trustee's Trial Exhibits will hereinafter be referred to as "Pl.Ex. __".) In the letter of intent, Grupo Serla acknowledged that it "thoroughly reviewed" the printing press and found its "capability to meet our requirements." (Pl.Ex. 1.)

### The Sale and Purchase Agreement

19. On March 19, 1997, Editorial Comercial and Goss entered into a Sale and Purchase Agreement (the "Contract To Sell The Press") as amended in which Goss agreed to sell and Editorial Comercial agreed to purchase the "Goss Universal 45" printing press and related equipment (the "Printing Press") for $5,948,860.00. (Pl.Ex. 2, ST 1074.) Editorial Comercial made a $100,000.00 cash down payment. (BO Ex. 1; citations to Bank One's Trial Exhibits will hereinafter be referred to as "BO Ex. __.")

### The Purchaser Granted Goss a Security Interest in the Printing Press to Secure Payment

20. In order to secure payment of the purchase price, the Purchaser, Editorial Comercial, granted Goss a security interest in the Printing Press. (Pl.Ex. 2, ST 1057.) The security interest attached to "all attachments, accessories, improvements, replacements and proceeds, including insurance proceeds ... resulting from any sale, assignment or other conveyance, or damage or destruction thereof...." (Pl. Ex. 2, ST 1057, ¶ 15.)

21. The Purchaser also agreed not to "sell, assign or convey or in any manner, cause or permit a transfer of any present or future interest in the Secured Collateral [i.e. the Printing Press]." (Pl.Ex. 2, ST 1057, ¶ 15a.)

### The Purchaser Pledged To Hold The Printing Press In Safekeeping For Goss

22. As part of the Contract To Sell The Press, the Purchaser also executed a Pledge on the Printing Press. (Pl.Ex. 2, ST 1070.) The object of the Pledge was to guarantee the performance of the obligations to pay Goss the purchase price of the Printing Press. (Pl.Ex. 2, ST 1070.)

In the Pledge, Guarneros, the 97% owner of the Purchaser, admitted receiving the Printing Press and agreed to hold it in safekeeping under the Pledge. (Pl.Ex. 2, ST 1070.)

23. The Purchaser and Guarneros further agreed in the Pledge that the "SELLER [Goss] may request the Judge to authorize the sale of the Machinery given in pledge if the PURCHASER does not perform the payment obligations pursuant to Addendum 'B' and Article 341 of the General Law of Credit Instruments and Operations." (Pl.Ex. 2, ST 1070.) The signed Pledge further stated, "For the interpretation, performance and execution of this pledge, the parties hereby expressly submit themselves to the laws and courts of Mexico, Federal District, Mexico." *Id.* However, no motion was filed to block Plaintiff's suit because this action was filed here instead of in Mexican courts, nor did the Foreign Defendants brief or argue the choice of law clause. The Foreign Defendants did not rely on that provision at all, and pursuant to the Final Pre–Trial Order they thereby waived it.

### Bank One Financed The Sale Of The Printing Press

24. The Contract To Sell The Press was subject to securing suitable financing. (Pl.Ex. 2, ST 1068.) Bank One agreed to finance the transaction. (Pl.Ex. 3.)

25. In connection with financing of the sale, Grupo Serla and Editorial Comercial executed a promissory note (the "Grupo Serla Note") on September 4, 1997 in the amount of $5,370,000.00 for the financed portion of the purchase price. (Pl.Ex. 4.) Guarneros signed the Grupo Serla Note "por aval," that is personally guaranteeing the same. (Pl.Ex. 4.) Guarneros thereby became responsible for payments on the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 51–52.)

26. Bank One then financed the sale by purchasing the Grupo Serla Note from Goss pursuant to a Note Purchase Agreement. (Pl.Ex. 3.) Bank One paid the full face amount for the Grupo Serla Note, $5,370,000.00, to or on behalf of Goss as follows: (1) payment to Goss via wire transfer by Bank One to Goss' account at Banker's Trust Co. in the amount of $5,022,594.00; (2) payment to Exporters Insurance Company Ltd. ("Exporters") via wire transfer made by Bank One on behalf of Goss in the amount of $320,556.00 to pay Goss' obligation to pay the insurance premium; and (3) an arrangement fee paid to Bank One in the amount of $26,850.00 in satisfaction of Goss' obligations under Article II(D) of the Note Purchase Agreement.

### The Credit Insurance Policy

27. The Note Purchase Agreement provided that Goss would arrange for Exporters to provide an insurance policy for the benefit of Bank One which would provide export insurance to cover 85% of Editorial Comercial's obligations to pay for the Printing Press. (BO Ex. 5, ST 1079, 3rd Whereas Clause.) Under the Note Purchase Agreement, Goss also warranted and agreed that it would do all things necessary to keep the Exporters insurance policy in full force and effect. (BO Ex. 5, ST 1083, Art. IV(B)(2).)

28. It was Goss' decision to choose Exporters, the company that issued the insurance policy. (L.Spano, 10/20/05, Test. 19.) Under the export credit insurance policy, Exporters agreed to indemnify Goss as the insured and Bank One as loss payee for 85% of the insured's loss "covered solely and directly by nonpayment of an 'Eligible Credit.'" (BO Ex. 8, BO 844.) "Eligible Credit" was defined as "a payment obligation insured herein ...," namely the amount due from Grupo Serla and Editorial Comercial to Goss under the Grupo Serla Note. Among other exclusions, the

548

policy provided that Exporters would not be liable for loss resulting from "commercial disputes between the Insured [Goss] and the Buyer [Editorial Comercial]." (BO Ex. 8, Test. 2, 5, 12, Endorsement No. 1, BO 00854; L. Spano, 10/20/05, Test. 16.) The policy also required Goss to "establish and maintain a first priority security interest in the goods sold to the Buyer [Editorial Comercial] under the Contract [Sale and Purchase Agreement]." (BO Ex. 8, p. 5, IV(J), BO 847.)

29. The purpose of the credit insurance policy was to provide "credit support"; that is, security that Bank One would be paid if Grupo Serla and Editorial did not make the payments. (BO Ex. 8, 2, BO 844.) Bank One would not have financed the transaction on terms that were agreed to without the credit insurance, as well as the letter of credit. (L.Spano, 10/20/05, Test. 15–16.) Goss arranged for such a letter of credit to be issued by Banker's Trust for the benefit of Bank One. This letter of credit provided part of the credit support that induced Bank One to purchase the Grupo Serla Note. (L.Spano, 10/20/05, Test. 16.)

30. On August 26, 1999, after Guarneros and His Companies failed to pay for the Printing Press, Goss made a claim under the Exporters credit insurance policy to fund the balance due to Bank One, amounting to 85% of the total amount due under the Grupo Serla Note. (BO Ex. 48.) At Goss' request, on September 2, 1999, Bank One sent Goss an "executed copy" of the Grupo Serla Note for use in making its insurance claim (BO Ex. 49), apparently referring to a copy of the executed Note, not a duplicate signed original.

31. After an insurance adjusting firm performed an investigation, Exporters denied Goss' insurance claim. (J. Gaynor, 10/18/05, Test. 43.)

## Guarneros and His Companies Failed To Pay For The Printing Press Despite Extreme Use Of It

32. After taking possession of the Printing Press and signing the Grupo Serla Note, Guarneros and His Companies failed to pay as agreed. (Pl.Exhs. 6, 118.) Guarneros and His Companies made only one payment of $75,000.00 on the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 45.)

33. On or about October 15, 1998, Grupo Serla made the $75,000.00 partial payment representing a portion of accrued interest due under the Grupo Serla Note. (Trustee's Amend. Compl., ¶ 30.) Grupo Serla sent this payment to Goss. This was the only payment that Grupo Serla, Editorial Comercial, and Guarneros made with respect to the Grupo Serla Note. (BO Ex. 28; L. Spano, 10/20/05, Test. 45–46.)

34. Goss in turn paid the entire $75,000.00 to Bank One on December 21, 1998. (BO Ex. 28.)

35. Grupo Serla contended at trial that the reason it did not make payments due from it for the Printing Press was that the Press did not meet specifications in the Purchase and Sale Agreement and did not perform as Goss represented that it would. (S. Guarneros, 10/5/05, Test. 44–46, 166–67; L. Spano, 10/20/05, Test. 31–32.) The Foreign Defendants alleged that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and based on Goss' presale representations. However, the evidence and facts presented at trial demonstrate that they used the Printing Press to produce commercially acceptable products with nine or ten workers using it for several shifts a day, and accepted rather than rejected the Press.

*Bank One Sent Numerous Notices To Guarneros And His Companies Demanding Payment*

36. As a result of the failure of the Foreign Defendants to pay amounts due under the Grupo Serla Note, Bank One formally notified Guarneros and His Companies of default on July 30, 1998. (Pl.Ex. 6.) In addition, Bank One sent at least 17 demand notices for past due installments to Guarneros and His Companies from the year 1997 through 2000. (Pl.Exhs. 5, 6, 7, 118.) However, Guarneros and His Companies still failed to make any principal or further interest payments due under the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 45.)

*Bank One And Goss Jointly Filed Suit Against Guarneros And His Companies To Collect On The Grupo Serla Note*

37. Due to the continued failure of Guarneros and His Companies to pay the amounts due under the Grupo Serla Note, Bank One and Goss jointly sued Guarneros and His Companies in the Circuit Court For The Eighteenth Judicial Circuit in DuPage County, Illinois (the "DuPage Litigation"). (Pl.Exhs. 9, 15.)

38. The joint complaint by Bank One and Goss was initially filed in May 1999 in DuPage County by a suburban law firm selected by Goss' General Counsel, Mary Ann Spiegel ("Spiegel"), with Bank One's consent. (BO Ex. 33.) When Spiegel became dissatisfied with the progress of the litigation in February 2000, she decided to replace the original litigation counsel with Joseph Krasovec ("Krasovec") of Schiff, Hardin & Waite, with whom she had worked before on various Goss matters. Bank One consented to Spiegel's selection of Krasovec to take over the litigation. Krasovec took his direction in the litigation primarily from Goss, and Goss paid his attorney's fees. (BO Ex. 53, SH & W 337; J. Krasovec, 10/24/05, Test. 4–7, 9–12.)

Once Krasovec took over, he filed a Second Amended Complaint on behalf of Goss and Bank One. (Pl.Ex. 15.)

39. In the DuPage Litigation, Bank One and Goss pleaded alternatively that Bank One or Goss or both were entitled to recover the amounts due and owing on the Grupo Serla Note. (Pl.Ex. 15.)

40. As joint plaintiffs, Goss and Bank One encountered difficulties in obtaining service of process over the Mexican Defendants, all of whom were located in Mexico. This caused the DuPage litigation to proceed slowly. (J. Krasovec, 10/24/05, Test. 32–33.) No recovery was achieved as a result of this litigation. In fact, service was obtained only over Editorial Comercial. (J. Krasovec, 10/24/05, Test. 32–33.) As a result, the pending DuPage litigation never proceeded to a judicial resolution of the joint complaint. (J. Krasovec 10/24/05, Test. 32–33.)

*Goss' Payments Under The Grupo Serla Note*

41. On September 1, 1998, Bank One wrote a letter to Goss giving Goss notice that it had not received payment due from Grupo Serla with respect to the payments due under promissory notes. (BO Ex. 21.) The letter stated that pursuant to the Note Purchase Agreement, Bank One was entitled to demand repurchase by Goss of 15% of its then-outstanding obligations. (BO Ex. 21.) Therefore, Bank One made a demand for Goss to pay 15% of its obligations equal to $724,950.00 plus $29,608.61 of accrued interest toward repurchase of the Note. (BO Ex. 21.)

42. In response, on or about September 15, 1998, Goss paid Bank One $754,558.61. (Pl.Ex. 8.)

43. After Guarneros and His Companies continued in their failure to make subsequent payments due, Bank One demanded that Goss pay the remaining 85%

due in order to repurchase the Grupo Serla Note. (BO Ex. 66; Pl.Ex. 21; R. Kaplan, 9/26/05, Test. 48–49.) Ronnie Kaplan ("Kaplan"), a First Vice President of Bank One, testified that he believed he called Joseph Gaynor ("Gaynor"), the Chief Financial Officer of Goss, and demanded that Goss pay the balance needed to repurchase the Grupo Serla Note. (R. Kaplan, 9/26/05, Test. 48.) Gaynor memorialized this demand in writing. (BO Ex. 66.) The letter proposed that Goss repurchase the Grupo Serla Note according to a specified payment schedule. (BO Ex. 66.)

44. After a series of negotiations regarding the remainder of obligations to repurchase the Grupo Serla Note (R. Kaplan, 9/26/05, Test. 49), on December 15, 2000 Goss and Bank One executed an agreement (the "Note Repurchase Agreement") wherein Goss agreed to repurchase the remaining 85% due for repurchase of the Grupo Serla Note from Bank One through delivery of a promissory note payable to Bank One ("Repurchase Note") in the amount of $5,675,495.12 (collectively the "Note Repurchase Transaction"). (Pl. Ex. 21.)

45. The Repurchase Note was payable in installments as follows:

| Date | Amount |
|------|--------|
| 12/15/00 | $ 750,000 |
| 12/31/00 | $1,500,000 |
| 01/31/01 | $ 500,000 |
| 02/28/01 | $ 750,000 |
| 03/31/01 | $ 750,000 |
| 04/30/01 | $ 750,000 |
| 05/31/01 | Remaining principal balance |

46. The Note Repurchase Agreement recognized that Goss "has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of US$805,000 plus accrued interest." (Pl.Ex. 21.) The Note Repurchase Agreement further stated, "[T]he Bank has demanded that the Company [Goss] repurchase the remaining 85% of the Grupo Serla Note by paying the Bank the

principal amount of US$4,564,500 plus interest through December 15, 2000 in the amount of US$1,110,995.12." (Pl.Ex. 21.)

47. The Note Repurchase Agreement "became effective upon the later to occur of (i) the execution of counterparts hereof by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the Company [Goss]." (Pl.Ex. 21.)

48. The Note Repurchase Agreement was executed as required and was delivered to Bank One and thereby became effective within one week of December 15, 2000. (M.Page, 9/30/05, Test. 44.) The Note Repurchase Agreement allowed Bank One to retain physical possession of the original Grupo Serla Note pending payment in full of all amounts due under or in connection with the Repurchase Note or as a court of competent jurisdiction might otherwise direct. (Pl.Ex. 21.)

49. Kaplan, a First Vice President of Bank One, signed the Note Repurchase Agreement on behalf of Bank One after a series of negotiations with Gaynor of Goss. (R. Kaplan, 9/26/05, Test. 53–54.) It was Kaplan's custom and practice to review documents before he signed them and not sign them if they were false. (R. Kaplan, 9/26/05, Test. 53–54.) Kaplan acknowledged through testimony his understanding that the Note Repurchase Agreement was an agreement for Goss to repurchase the Grupo Serla Note. (R. Kaplan, 9/26/05, Test. 56–57.)

*The Obligations Under The Repurchase Note And The Note Purchase Agreement*

50. The terms in the Repurchase Note given by Goss to Bank One differed from terms specified in the original Note Purchase Agreement. (Pl.Exhs. 3, 21.) The interest rate contained in the Repurchase Note differed from the interest rate contained in the original Grupo Serla Note (which evidenced the "obligations" under

the Note Purchase Agreement). (Pl. Exhs. 4, 21; R. Kaplan, 9/26/05, Test. 69–72.) The interest rate contained in the Repurchase Note equaled the Eurodollar Rate plus 1.5% per annum. (Pl.Ex. 21.) The interest rate contained in the Grupo Serla Note equaled the "LIBOR" rate plus 1% per annum. (Pl.Ex. 4.) Salas of Bank One testified that LIBOR and the Euro-dollar rate are the same. (A.Salas, 10/18/05, Test. 42.)

51. The Grupo Serla Note and the Repurchase Note also contained different default interest rates. The default interest rate contained in the Repurchase Note initially equaled the Eurodollar rate plus 4% and then converted to the prime rate plus 2% per annum. (Pl.Ex. 21.) The default interest rate contained in the Grupo Serla Note equaled LIBOR plus 4% and did not convert. (Pl.Ex. 4.)

52. Further, by its terms, the Note Purchase Agreement was freely assignable while the Repurchase Note was not generally assignable except to another financial institution. (Pl.Ex. 21.) The Note Purchase Agreement stated:

After the purchase hereunder, following prior written notice to the Supplier, the Lender may sell, transfer, pledge, negotiate, grant participations in or otherwise dispose of all or any part of the Notes purchased by the Lender under this Agreement to any party without increasing the Supplier's obligations hereunder, and any such party shall enjoy all the rights privileges, and obligations of the Lender under this Agreement with respect to such transferred notes.

(Pl.Ex. 3.)

The Repurchase Note provided:

The Bank may at any time assign this Note and its rights hereunder to any affiliate, and the Bank or any subsequent holder of this Note may at any time assign this Note and its rights hereunder to a financial institution or, with the consent of the Company which consent shall not be unreasonably withheld or delayed, to any other person or entity, provided, however, that such consent shall not be required if any of the events in the first sentence of the immediately preceding paragraph has occurred and is continuing.

The first sentence of the immediately preceding paragraph in the Repurchase Note provided:

In addition to, and without limitation of, any rights of the Bank under applicable law, if any amount payable hereunder is not paid within 5 days after the same becomes due, there is any material adverse change in the Company's financial condition, there is a material default under any agreement governing indebtedness of the Company under the Federal Bankruptcy Code or similar state law or if the Company becomes insolvent, howsoever evidenced, the Bank may declare all unpaid principal and interest payable hereunder immediately due and payable.

(Pl.Ex. 21.)

### The Bank Stopped Seeking Payment From Guarneros And His Companies

53. After December 15, 2000, the Bank stopped demanding payment for the amounts due under the Grupo Serla Note from Guarneros and His Companies. (A.Salas, 10/18/05, Test. 34–36.) Salas, Bank One's record-keeper for this transaction, testified that Bank One stopped sending demand notices to Guarneros and His Companies after that date because the relevant relationship was then between Bank One and Goss. (A.Salas, 10/18/05, Test. 34–36.) Thereafter, Bank One billed Goss on the Repurchase Note. (A.Salas, 10/18/05, Test. 34–36.)

54. Beginning on December 26, 2000, after Goss had made payments to Bank One pursuant to the Repurchase Note, Bank One billed Goss for amounts that were due under that Repurchase Note. (Pl.Ex. 121.)

55. The specific dollar amounts claimed by Bank One in its invoices to Goss corresponded to the Repurchase Note and not to the Grupo Serla Note. (Pl.Ex. 121.) The default notices sent by Bank One to Guarneros and His Companies sought default interest of LIBOR plus 4% because that was the default interest rate contained in the Grupo Serla Note owned by the Bank at that time. (Tr Ex. 118; R. Kaplan, 9/26/05, Test. 68–70; A. Salas, 10/18/05, Test. 41–43.) However, the default notices sent to Goss were based on the interest rate contained in the Repurchase Note. (A. Salas, 10/18/05, Test. 41–43; Pl. Exhs. 33, 34, 51, 64 (BO 03626), 74, 121.)

### Bank One's Internal Computer System

56. Bank One maintains a computer system called an LS2 System which keeps track of accounting events. (Pl.Ex. 119; A. Salas, 10/18/05, Test. 53.) The LS2 System reports reflected that on December 15, 2000 (the date of the Note Repurchase Transaction) the Grupo Serla Note was paid off and a new commitment representing the Repurchase Note was set up. (A.Salas, 10/18/05, Test. 54.) Salas of Bank One testified that this was done for accounting purposes, as Bank One did not want to show two assets on its books. (A.Salas, 10/18/05, Test. 54.)

### Goss' Payments Under The Repurchase Note

57. Prior to filing for bankruptcy protection, Goss made all payments due pursuant to the Repurchase Note except the April and May 2001 payments. (M.Page, 9/30/05, Test. 44.)

58. The April and May 2001 repurchase payments that were due for those months totaled $1,425,495.12. Goss therefore owed Bank One less than $1.5 million in principal and accrued interest with respect to its obligation to repurchase the Grupo Serla Note at the time that Goss filed its Chapter 11 bankruptcy petition on September 10, 2001. (J. Gaynor, 10/18/05, Test. 72.)

59. In addition to paying Bank One $925,728.17 ($805,500.00 plus interest) as earlier noted to repurchase what Bank One characterized in the Note Repurchase Agreement as 15% of the Grupo Serla Note, Goss paid Bank One payments totalling an additional $4,250,000.00 pursuant to its repurchase obligations. (Pl. Exhs. 21; M. Page, 9/30/05, Test. 44.) Thus, prior to filing for bankruptcy protection, Goss paid Bank One a total of $5,175,858.50, (Pl.Ex. 21; M. Page, 9/30/05, Test. 44), then leaving only $1,425,495.12 in principal due on Goss' repurchase obligation.

### Guarneros And His Companies Agreed To Sell The Printing Press Despite The Fact They Had Not Paid For It

60. Guarneros and His Companies took steps to sell the Printing Press to a third party despite the fact they had not yet paid for it. (Pl.Exhs. 29, 129.) This sale process began on or about May 23, 2001 when Guarneros and His Companies entered into a letter of intent with Quebecor World Inc. ("Quebecor"). (Pl.Ex. 23.) In the letter of intent, Quebecor expressed its interest in acquiring certain "Selected Assets" for $13,000,000.00 through a wholly owned Newco subsidiary, Quebecor World Directory Mexico, S.A. de C.V. (Pl.Ex. 23.) The "Selected Assets" included the Printing Press which had been purchased from Goss. (Pl.Ex. 23, ST 0257.)

61. A condition precedent to the Quebecor purchase was that the Printing Press and other Selected Assets would be

free and clear of all liens, claims, and liabilities at closing. (Pl.Ex. 23, ST 234.) If the assets were not free and clear, Quebecor had the right to withhold money as necessary until any liens were removed. (S.Guarneros, 10/5/05, Test. 83–84.)

62. Quebecor placed a total value of $13,000,000.00 on all the assets it was interested in purchasing (Pl.Ex. 23), of which it put a specific value of $4,000,000.00 on the Printing Press. (Pl.Ex. 23, ST 257.) The Printing Press was the highest valued single asset Quebecor agreed to purchase. (Pl.Ex. 23, ST 257.)

*The Agreement To Pay Goss $2,700,-000.00*

63. Guarneros and His Companies understood that the Printing Press had to be free and clear of all liens, claims, and liabilities prior to closing the sale with Quebecor. (S.Guarneros, 10/5/05, Test. 58.) Specifically, Guarneros realized that he needed the Goss lien released to close the deal with Quebecor. (S.Guarneros, 10/5/05, Test. 87.)

64. Therefore, on or about June 25, 2001, after four years of failing to pay any principal on the Grupo Serla Note but only four weeks after receiving the Quebecor letter of intent to purchase the Printing Press for $4,000,000.00 as part of the $13,000,000.00 asset sale, Guarneros came to Chicago and executed a handwritten summary of terms for agreement with Goss ("Agreement in Principal [sic]") on behalf of his company, Grupo Serla. (Pl. Ex. 25.) Goss never sent to Bank One, and Bank One never received from Goss a copy of the handwritten document. (M.Page, 10/25/05, Test. 20.) However, the lawyer representing both Bank One and Goss in the state court litigation received a formal typewritten draft agreement detailing the specific terms of the handwritten agreement.

65. On June 26, 2004, Joseph Krasovec ("Krasovec"), who represented Goss and Bank One in the DuPage litigation, became aware of Goss' intent to settle separately because Spiegel, Goss' General Counsel, sent him a formal typewritten draft agreement to review. Krasovec sent a fax back to Spiegel with a mark-up of the draft and wrote: "HERE ARE MY SUGGESTED CHANGES. DID YOU LEAVE BANK ONE OFF FOR A PARTICULAR REASON? I'M SURE GRUPO WILL INSIST THEY BE ON IT." (Pl.Ex. 26.)

66. In the Agreement in Principal [sic], Guarneros agreed to pay Goss $2,700,000.00 in exchange for the Printing Press, "as is, where is," and Goss' release of any security interest, retention of title, or pledge in the Printing Press. (Pl.Ex. 25.) At that time, Grupo Serla had the ability to pay $2,700,000.00 to Goss from proceeds of the asset sale to Quebecor. (S.Guarneros, 10/5/05, Test. 74.) At the meeting where the Agreement in Principal [sic] was executed, a representative of Goss told Guarneros that Goss owned the Grupo Serla Note. (S.Guarneros, 10/5/05, Test. 72.)

67. The Agreement in Principal [sic] was subject to approval by Goss management. (Pl.Ex. 25.) Goss' management approved the agreement on or about the date the Agreement in Principal [sic] was drafted, June 25, 2001. (J. Gaynor, 10/5/05, Test. 190.)

68. Guarneros considered this agreement to be the final agreement between the parties on the subject. (S.Guarneros, 10/5/05, Test. 170.) However, Spiegel recognized that the June 25, 2001 Agreement in Principal [sic] was not a final agreement between Goss and Grupo Serla and told Mark Page ("Page"), an attorney for Bank One:

Needless to say, I am frustrated by the hurry up request from Serla for a meet-

ing to discuss settlement, followed by silence. It reminds me of past attempts to reach settlement in this matter and it doesn't seem to be promising. (Pl.Ex. 36, BO 00318.)

### Bank One Was Notified Of The Agreement In Principal [sic] Between Goss And Grupo Serla

69. On July 2, 2001, Krasovec of Schiff Hardin & Waite, who had been representing both Goss and the Bank in the DuPage Litigation, told Bank One that Goss and Grupo Serla met and reached an agreement in principle to settle Goss' claims against Grupo Serla. (Pl.Ex. 27.) At trial, Page further admitted that Bank One knew about the Agreement in Principal [sic] between Goss and Grupo Serla. (M.Page, 9/30/05, Test. 47, 58–59.)

### The Contract to Sell The Printing Press To Quebecor

70. On July 5, 2001, shortly after executing the Agreement in Principal [sic] with Goss, Guarneros executed the final agreement selling the Printing Press to Quebecor. (Pl.Ex. 29.) The Agreement was officially titled, "Acquisition of Assets of Grupo Serla S.A. DE C.V. By Quebecor World Directory Mexico, S.A. DE C.V." ("Contract To Sell The Press To Quebecor"). (Pl.Ex. 29.) In this Contract To Sell The Press To Quebecor, Guarneros represented to Quebecor that Grupo Serla agreed to pay Goss $2,700,000.00 for the Printing Press and to accept the Printing Press in its present condition pursuant to the June 25, 2001 Agreement in Principal [sic]. (Pl.Ex. 29(a).)

### Bank One Was Notified Of The Sale To Quebecor

71. On August 9, 2001 Goss notified Bank One that Quebecor bought the assets of Grupo Serla. (Pl.Ex. 36.) Goss continued to notify Bank One periodically about the status of the sale. For example, on September 20, 2001, Goss told Page that the sale of assets to Quebecor was supposed to close in November. (Pl.Ex. 43.) Goss told Bank One on this same date that Grupo Serla told Goss that it would fund the payments due under the Agreement in Principal [sic] from proceeds of the sale. (Pl.Ex. 43.)

### The Pledge Proceedings In Mexico

72. When Guarneros and His Companies agreed to sell the Printing Press to Quebecor, Goss engaged Jorge Leon Orantes, a Mexican commercial litigation lawyer associated with Goodrich, Riquelme & Associates for over 43 years, to enforce the Pledge Agreement. (J. Orantes, 9/19/05, Test. 3.) Orantes testified at trial that he filed an application to enforce the Pledge Agreement in Mexico on two occasions (the "Pledge Proceedings"). (J. Orantes, 9/19/05, Test. 50.) Orantes testified that the judge rejected the pledge sale claim because it was necessary for Goss to present the original executed Grupo Serla Note, and not a copy. That was impossible for Goss to do, as Bank One still held the original executed note.

73. On August 9, 2001, Goss notified Bank One via e-mail about the Pledge Proceedings. (Pl.Ex. 36.) Specifically, Goss told Bank One that it instructed its counsel to get an injunctive case on file in Mexico based on the pledge included in the Sale and Purchase Agreement. (Pl.Ex. 36.) Goss told Bank One that it asked Krasovec to draft a letter to Quebecor's attorney regarding the Pledge. (Pl.Ex. 36.) Goss also told Bank One that both steps were aimed at protecting the asset which secured payment of the purchase price under the contract. (Pl.Ex. 36.)

### Goss' Filings For Bankruptcy Protection

74. In September 1999, Goss filed a Chapter 11 proceeding in Delaware. (J. Gaynor, 10/18/05, Test. 75–76.) That filing

was made after Goss had paid Bank One 15% of the buyer's obligations pursuant to the Note Repurchase Agreement plus $4,250,000 under the Repurchase Note leaving only a balance of $1,425,495.12 due under the Note Repurchase Agreement. (*See* Findings Nos. 46 and 60.)

75. Goss, as bankruptcy debtor, did not list the Grupo Serla Note on Schedule B, Personal Property, (BO Ex. 46, KE 001221), but did schedule the Note Purchase Agreement on Schedule G, Executory Contracts. (BO Ex. 47, p. KE 001569)

76. Goss' original 1999 bankruptcy case under Chapter 11 resulted in a confirmed plan in which Goss assumed the Note Purchase Agreement as an executory contract. (J. Gaynor, 10/18/05, Test. 78–79.) The confirmed Chapter 11 plan in that case was not offered in evidence.

77. On September 10, 2001, Goss filed a second Chapter 11 proceeding in this Court. The context of this filing was Goss' inability to enforce the Pledge Agreement in a Mexican court, and inability to pay the last two payments due under the Repurchase Note in April and May of that year.

78. On October 25, 2001, Goss filed its bankruptcy schedules in the new Chapter 11 case. (BO Exhs. 97, 98, 165.) Goss listed the Note Purchase Agreement with First National Bank of Chicago (the predecessor of Bank One in 1997) as an executory contract on Schedule G–Executory Contracts and Unexpired Leases. (BO Ex. 98.) Bank One is not listed as a secured creditor on Schedule D. (BO Ex. 165.)

79. When this bankruptcy case was filed under Chapter 11, Bank One was aware of the following: (1) Goss had paid Bank One $5,175,858.50 pursuant to the Note Repurchase Agreement; (2) Guarneros and His Companies were in the process of selling the Printing Press; (3) Grupo Serla had signed a handwritten

Agreement in Principal [sic] to pay Goss $2,700,000.00; and (4) Goss had filed an action in Mexico to enforce its lien, but could not succeed because Bank One held the original signed Grupo Serla Note.

**Bank One Asked Goss For Information Regarding How Much It Would Receive From The Settlement**

80. On September 20, 2001, Bank One asked Goss for an update on Goss' discussions with Guarneros and His Companies as well as Goss' intentions with respect to the proceeds of the Agreement in Principal [sic] with Grupo Serla. (Pl.Ex. 43.) Goss informed Bank One that the asset sale to Quebecor, including the Printing Press, was supposed to close in November and that Grupo Serla told Goss that it would fund the payments due under the Agreement in Principal [sic] from the proceeds of the asset sale to Quebecor. (Pl.Ex. 43.)

81. On or about October 3, 2001, Goss also informed Bank One that the Agreement in Principal [sic] with Grupo Serla would be subject to approval by the bankruptcy court and that it believed none of the proceeds of the Agreement in Principal [sic] would be allocated to Bank One. (Pl. Ex. 46.) Spiegel of Goss told Bank One that she believed that payments due to Bank One pursuant to the Repurchase Note were a pre-petition liability and would be dealt with by the plan of reorganization in the pending Chapter 11 case. (Pl.Ex. 46.)

82. Bank One believed that it would recover little or nothing under the Chapter 11 plan of reorganization. The following is an excerpt of the testimony of Page of Bank One:

Q. And, in fact, you looked at the plan of reorganization, right?

A. Yes.

Q. And under the plan of reorganization, the unsecured creditors might

receive stock or a small amount of cash, but it was not much, correct?

A. Right.

(M.Page, 9/30/05, Test. 57–58.)

83. Bank One's credit managers subsequently committed its analysis to writing. In a Credit Approval Summary for Bank One, the following was reported: (1) Goss was then in Chapter 11 for the second time in two and a half years; (2) the secured debt was presently trading at 10% to 20% of face value; and (3) if the Bank did not sell the Grupo Serla Note it would only receive its pro-rata share of the equity of a reorganized Goss and whatever could be recovered through a lawsuit against Grupo Serla in Mexico. (Pl.Ex. 91.) The Bank believed little if anything would be recovered under the above scenarios. (Pl.Ex. 91.)

### Bank One Notified Guarneros And His Companies That It Wanted Part Of The Settlement

84. Page, the lawyer for Bank One, sent a letter to William O'Connor ("O'Connor"), counsel for Guarneros and His Companies, seeking to be part of the settlement discussion with Goss so that a "global resolution" could be reached. (Pl.Ex. 49.) In order to support this request, Bank One represented that it had purchased the Grupo Serla Note and that Guarneros and His Companies remained fully obligated to Bank One on the Grupo Serla Note. (Pl. Ex. 49.) Bank One also represented that it had the right to enforce the security for the Grupo Serla Note. (Pl.Ex. 49.) Prior to this time, Bank One had not taken steps to settle with the Foreign Defendants on its own. (M.Page, 9/30/05, Test. 57.)

85. In addition to the letter, Page also called O'Connor and told him that Bank One owned the Grupo Serla Note. (M.Page, 9/30/05, Test. 57.)

86. On October 11, 2001 counsel for Goss in Mexico (the "Mexican Counsel") asked DuPage Litigation Counsel for Bank One and Goss (the "DuPage Litigation Counsel") to send documents to allow the proceedings for enforcement of the pledge to succeed. (Pl.Ex. 54.)

87. On October 12, 2001, the DuPage Litigation Counsel responded by notifying Mexican counsel and Bank One that because of a potential conflict of interest between Goss and Bank One, Mexican counsel should request anything needed directly from Goss. (Pl.Ex. 54.)

88. On October 12, 2001, the DuPage Litigation Counsel advised Bank One of a potential conflict of interest between Goss and Bank One. (Pl.Ex. 54.)

89. On October 15, 2001, the DuPage Litigation Counsel confirmed that he had additional discussions with Bank One regarding a conflict of interest between Goss and Bank One. (BO Ex. 107.)

### Quebecor Issued Checks Endorsed To Goss

90. Pursuant to the Modified Agreement between Quebecor and Grupo Serla, Quebecor issued a check on October 16, 2001 payable to Grupo Serla and then endorsed by Grupo Serla in favor of Goss in the amount of $1,600,000.00. (Pl.Ex. 57.) Also on or about October 16, 2001, Quebecor issued another check payable to Grupo Serla and also endorsed by Grupo Serla in favor of Goss in the amount of $200,000.00. (Pl.Ex. 58.)

91. Guarneros directed that these two checks were to be directed and transmitted to Goss. (S.Guarneros, 10/05/05, Test. 89.) Guarneros testified that it was his intent to pay Goss 100% of those funds. (S.Guarneros, 10/05/05, Test. 89.) He said that the two checks were actually to be given to Goss as soon as Guarneros and His Companies received assurance as to

who owned the Grupo Serla Note. (S.Guarneros, 10/05/05, Test. 96–97.)

### Guarneros And His Companies Met With Bank One Through Their Representatives In Chicago

92. In Chicago, John Adams ("Adams"), an agent of Guarneros and His Companies met with Chicago counsel for Guarneros and His Companies, William O'Connor ("O'Connor") and Sam Tenenbaum ("Tenenbaum"). (Pl.Ex. 129, Adams Dep., 61–70). Adams and counsel for Guarneros and His Companies then met with representatives of Bank One. (Pl.Ex. 129, Adams Dep., 70) Bank One representatives knew O'Connor represented Guarneros and His Companies at that time. (M.Page, 9/30/05, Test. 62.) Goss was not represented at the meeting. (M.Page, 9/30/05, Test. 62.) Page did not tell the Bankruptcy Creditors' Committee, the Bankruptcy Court or Debtor's Bankruptcy Counsel about the meeting. (M.Page, 9/30/05, Test. 65.)

93. Shortly before the meeting, Adams (a representative of Guarneros and His Companies) sent a detailed e-mail to Guarneros. (Pl.Ex. 59.) In the e-mail, Adams confirmed to Guarneros the following:

a. He spoke with Goss;

b. Goss told him that it had instructed its lawyers in Mexico to do whatever was necessary to file a lien on the equipment in Mexico;

c. the closing of the asset sale had not taken place yet;

d. Bank One had contacted Bill O'Connor in writing (Guarneros was sent a copy) and claimed Bank One still owned the note;

e. he understood Goss had been making payments on the Note;

f. he was going to Chicago;

g. the first thing he was going to do when he got to Chicago was to go to Bank One and find out if Bank One owned the note (" 'we' have to know who owns the Note and what was in the agreement between Bank One and Goss");

h. Goss cannot make any agreement now without Court approval and/or creditor approval: i.e. "whatever they say must first be agreed upon by the judge or the creditors committee. They are the ones with the power to accept or reject any offer or to make any agreement";

i. we could have a meeting with both Bank One and Goss at the same time. They would have to agree on how the money would be split between the both of them. If this has to happen the odds are they will never agree; and

j. Cuco told me today that you were sending me the checks by air to Oklahoma. As soon as I receive those checks, I am leaving for Chicago;

(Pl.Ex. 59.)

94. At the meeting, Adams or Tenenbaum raised the issue of having Bank One sell the Grupo Serla Note directly to the makers of the Note. (M.Page, 9/30/05, Test. 63.) The first document drafted by Page relating to the sale of the Note was based on this assumption. (M. Page, 9/30/05, Test. 62; Pl.Ex. 70.) Page also confirmed at trial that Bank One knew Adams had brought the checks endorsed to Goss. (M.Page, 9/30/05, Test. 64.) Page testified that Adams told him at the meeting that there was also a budget to resolve the claims of Grupo Serla's various creditors and that he had the money available in the United States. (M.Page, 9/30/05, Test. 64.)

95. Either at that meeting or the day after the meeting, Bank One (through its counsel Page) again told Adams that Bank One owned the Grupo Serla Note. (Pl.Ex. 129, Adams Dep., 68–69.) Based on this representation, Guarneros and His Companies refused to meet further with Goss, and they instructed Quebecor to cancel the two checks that had been endorsed to Goss. (Pl.Ex. 69(b), 69(c).)

96. Guarneros and His Companies had intended to meet with Goss through their lawyers and Adams while he was in Chicago. (Pl.Ex. 129, Adams Dep., 68–69.) However, based on Bank One's representation that it owned the Grupo Serla Note, Adams called Goss and said that there was no reason to meet. (Pl.Ex. 129, Adams Dep., 68–69.) Adams testified to what he observed: "We got two people on different sides both say that they own the note and they-and with the note is all rights to that press." (Pl.Ex. 129, Adams Dep., 61.) Adams testified that a Bank One representative told him, "Look, we're the owners of this press. Goss isn't. You're negotiating with the wrong people." (Pl.Ex. 129, Adams Dep., 56.)

### Quebecor Confirmed It Was Withholding Money For Goss

97. On October 29, 2001, pursuant to Goss' inquiry, Quebecor confirmed that certain funds were in escrow and remained to be paid on November 15, 2001. (Pl.Ex. 61.) Quebecor also confirmed that it had been directed to issue certain specific payments to various creditors including Goss at the closing. (Pl.Ex. 61.)

98. On November 15, 2001, Quebecor wrote Guarneros and told him the following:

(1) Goss' Attorney notified Quebecor about the beginning of the Pledge Proceeding seeking the sale of the Printing Press; (2) Goss indicated that the amount of the debt was $5,940,000.00; (3) Quebe-cor contemplated making a payment in the amount of $5,000,000.00 in fulfillment of the modified asset sale agreement; (4) as a result of the notification by Goss, Quebecor was going to retain $5,000,000.00; and (5) once Quebecor receives evidence that there is no contingency on the free use, possession, and enjoyment of the Printing Press acquired by Quebecor, Quebecor will proceed to make the payment. (Pl.Exhs. 69, 69(a).)

99. On November 15, 2001, Grupo Serla responded in writing to Quebecor stating: (1) As to the checks in amounts of $1,600,000.00 and $200,000.00 endorsed over to Goss, Grupo Serla had been made aware that Goss no longer held the right for collection; (2) Bank One now had the collection rights on this debt; (3) therefore, Grupo Serla has given back the checks so that they were canceled; (4) it had been talking to Bank One with the objective of coming to an understanding on the payment; (5) it believed it would be able to solve this circumstance quickly so that new checks could be generated in place of those which were cancelled; and (6) with that understanding, it would appreciate it if the payment to Goss would be stopped. (Pl.Exhs. 69(b), 69(c).)

### Bank One Sold The Grupo Serla Note To The Foreign Defendants Without Seeking An Order Modifying The Automatic Stay

100. Having succeeded in blocking the payments to Goss, Bank One sold the Grupo Serla Note and related items to Union Industrial Mexicana, S.A. de C.V. ("Union Industrial") for $1,100,000.00. (Pl.Exhs. 88, 106.)

101. As a result of the Note sale to Union Industrial and delivery of the Note to Union Industrial: (1) Goss did not receive any part of the $5,000,000.00 withheld by Quebecor; (2) Goss did not receive

any part of the $2,700,000.00 Grupo Serla agreed to pay to Goss; and (3) Goss did not receive the two checks totaling $1,800,000.00 which had been endorsed over to Goss (Pl.Ex. 130, Guarneros Dep., 90); and (4) without the Note Goss lost forever any ability to enforce collection on that Note or enforce the Pledge Agreement in a Mexican court. Instead, Bank One received $1,100,000.00. (M.Page, 9/30/05, Test. 100.)

### The Connection Between Union Industrial And Guarneros And His Companies

102. Union Industrial is related to Guarneros and His Companies. (S.Guarneros, 10/5/05, Test. 30–35.) Guarneros testified to the following: (1) he owns 97% of Grupo Serla and Editorial Comercial; (2) he previously owned 97% of Union Industrial; (3) all three of these companies are located at 711 Suite C, Batriostismo Mexico City; (4) the lawyer for all three companies is Oscar Sosa Gueterez; and (5) none of the three companies has ever had any employees. (S.Guarneros, 10/5/05, Test. 30–35.)

103. Bank One representatives were aware before the closing of the transaction with Union Industrial that Union Industrial was connected to Guarneros and His Companies. (M.Page, 9/30/05, Test. 85.)

104. Guarneros claimed that he sold Union Industrial to his father approximately four years prior to his testimony (about the same time that Union Industrial purchased the Grupo Serla Note). (S. Guarneros, 10/5/05, Test. 31.) Guarneros testified at his deposition that there were no written documents regarding the sale of Union Industrial. (Pl.Ex. 130, Guarneros Dep., 16.) At trial, Guarneros revised his testimony to say that he does not remember any written documents regarding the sale, but that there must be some. (S.Guarneros, 10/5/05, Test. 32.) Guarneros acknowledged in his testimony at trial that

he did not produce at trial any documents regarding the alleged sale. (S.Guarneros, 10/5/05, Test. 31–34.)

### The Negotiation Of The Union Industrial Note Purchase Agreement

105. Sale of the Grupo Serla Note by Bank One to Union Industrial was accomplished through two documents: a "Note Purchase Agreement" and an "Amended And Restated Note Purchase Agreement" (collectively the "Union Industrial Note Purchase Agreement"). (Pl.Exhs. 88, 106.) The first draft of the Union Industrial Note Purchase Agreement was prepared by O'Connor, Chicago counsel for Guarneros and His Companies as well as Union Industrial. (Pl.Ex. 75.) On November 21, 2001, O'Connor delivered the first draft to Bank One. (Pl.Ex. 75.) In his cover letter attached to the draft, O'Connor stated, "[A]lthough we are anxious to close, we do not wish to notify Goss until we have reached a signed agreement." (Pl. Ex. 75.)

106. Page did not send the Union Industrial Note Purchase Agreement to Goss or anyone who might be looking out for Goss' (or its creditors') interests. (M.Page, 9/30/05, Test. 71–73.) At trial, Page claimed that he and O'Connor (counsel for Guarneros and His Companies) were in fact looking out for Goss' interests, but his further testimony showed the disingenuous nature of such a claim:

Q. Did you send it to anyone other than you who might be looking out for Goss' interests?

A. Other than me?

Q. Yeah.

A. I sent it to—Oh. I sent it to—

Q. Who might be looking—

A. —O'Connor

Q. —for Goss' interest.

A. I sent it to O'Connor.

Q. Well, O'Connor wasn't looking our for Goss' interests, was he?

A. Well, I guess he wanted to settle with them, but ...

Q. You think O'Connor was looking out for Goss's interests?

A. No. I mean, he wanted to—no. He was looking out for his clients' interests.

Q. His clients were adverse to Goss, weren't they?

A. Yes, they had a dispute with Goss.

(M.Page, 9/30/05, Test. 80–81.)

107. On or about December 10, 2001, Bank One and Union Industrial executed the first of the Union Industrial Note Purchase Agreements. (Pl.Ex. 88.) Prior to this date, Goss was not notified of the negotiation or the agreement. (M.Page, 9/30/05, Test. 71–73, 80–84.) When a final agreement was reached, Bank One did not notify bankruptcy counsel for the Debtor or the Bankruptcy Court or Creditors' Committee. (M.Page, 9/30/05, Test. 97–98.)

108. The Union Industrial Note Purchase Agreement contained a provision that the Bank has argued here purported to preserve Goss' recourse against the makers and guarantor of the Grupo Serla Note. Specifically, it provided in section 7.1 that:

[n]either this agreement nor any action taken hereunder shall impair or affect in any way any rights, claims or remedies, if any, Goss may have against Editorial Comercial, Grupo Serla, and/or Sergio Guarneros Trujillo immediately before the execution of this Agreement. Any such rights of Goss shall continue the same as if this Agreement had not been made or consummated.

(BO Ex. 119, § 7.1, BO 02748–49.)

In the light of the knowledge of Bank One representatives that the Foreign Defendants denied that Goss had any rights on claims or remedies against the Foreign Defendants (Pl.Ex. 106; BO 02820) and in the light of Bank One's delivery of the Note, to an entity related to the makers, the claims that this bit of wording protected Goss (without showing it to Goss to ask for the views of its lawyers) was pure sophistry or perhaps the only "fig leaf" of protection to Bank One that its lawyers could provide.

109. After Bank One entered into the 2001 Note Purchase Agreement with Union Industrial on December 10, 2001, in purported compliance with paragraph 4.1 of the Note Purchase Agreement, Bank One notified Goss by sending written notice of its intention to do so to Spiegel and Gaynor, Goss' Chief Financial Officer, and Krasovec, counsel in the DuPage litigation, in advance of the closing of the transaction with Union Industrial. (BO Exhs. 116, 117.) However, Bank One never sent a copy of the proposed draft agreement or executed agreement to Goss. (M.Page, 10/25/05, Test. 79.)

### The Purchase Price

110. In the Union Industrial Note Purchase Agreement, Bank One sold various items to Union Industrial in addition to the Grupo Serla Note (namely, the Repurchase Note, the Pledge, and its proof of claim) for $1,100,000.00. (Pl.Exhs. 88, 106.)

### Bank One Closed The Union Industrial Note Purchase Agreement

111. On December 12, 2001, representatives of Bank One internally approved the sale of the Grupo Serla Note to Union Industrial. (Pl.Ex. 91.) The sale resulted in interest income of $671,000 for the Bank. (Pl.Ex. 91.) Goss did not receive any portion of the sale proceeds. (M.Page, 9/30/05, Test. 77.)

112. At the closing, Bank One gave the original Grupo Serla Note and the Pledge to O'Connor who was the lawyer for: (1) the makers of the note; (2) the defendants named in the Pledge Proceedings; (3) the parties who sold the Printing Press to Quebecor; and (4) the parties who agreed to pay Goss $2,700,000.00 in the Agreement in Principal [sic]. (M.Page, 9/30/05, Test. 99.)

113. Page made sure that Bank One received the $1,100,000.00 wire transfer before he gave the original documents to O'Connor. (M.Page, 9/30/05, Test. 76, 100.)

*Bank One Admitted It Knew the Union Industrial Note Purchase Agreement Would Affect The Agreement In Principal [sic] Between Goss And Grupo Serla*

114. Bank One's representative Page admitted that Bank One knew that the Union Industrial Note Purchase Agreement that Bank One entered into with the Foreign Defendants would cause the Foreign Defendants to "gain leverage" in their settlement discussions with Goss. (M.Page, 9/30/05, Test. 102.) Bank One was also aware that as a result of the deal negotiated between Bank One and the Foreign Defendants, the Foreign Defendants would deny that Goss had any rights, claims or remedies against Guarneros and His Companies. (Pl.Ex. 106; BO 02820.) Bank One, however, failed to provide Goss with a copy of the sale agreement and specific details of the transaction. (M.Page, 9/30/05, Test. 136.) It also failed to inform Goss that the Foreign Defendants intended to deny that Goss had any rights in the Grupo Serla Note.

115. When Union Industrial came before the Bankruptcy Court and first claimed in pleadings that it owned the Grupo Serla Note, Bank One (who was served with those pleadings) (M.Page, 9/30/05, Test. 102) did not file anything

disputing that Union Industrial owned the Grupo Serla Note at that time. (M.Page, 9/30/05, Test. 102.)

*Bank One Executed Documents Post–Petition Intended To Prevent Goss From Receiving Money*

116. Bank One maintained possession of the Grupo Serla Note continuously from the date of its purchase until it assigned its right, title and interest in the Note to Union Industrial. (L. Spano, 10/20/05, Test. 45; M. Page, 9/30/05, Test. 96.) The Union Industrial Note Purchase Agreement closed on December 19, 2001.

117. On December 19, 2001 Union Industrial wrote to Quebecor and advised Quebecor that Union Industrial, not Goss, was then owner of the Grupo Serla Note asserting that it had purchased the Grupo Serla Note from Bank One. (Pl.Exhs. 102, 102(a).) Union Industrial also told Quebecor that it was not reserving any right against Quebecor and that the Printing Press then belonged to Quebecor free and clear of any encumbrances. (Pl.Exhs. 102, 102(a).)

118. On or about December 20, 2001, Kaplan of Bank One signed a letter addressed to "Union Industrial—Mexico" stating the following:

Re: Goss Promissory Note

To Whom It May Concern:

Yesterday, Bank One sold its promissory note from Goss Graphics to Union Industrial. William O'Connor has the signed documents. The money from this transaction has been received by Bank One. The only remaining issue is the receipt of an execution copy of the note purchase agreement signed by Union Industrial with all the pages initialed.

(Pl.Ex. 107.)

119. It is inferred and found from the circumstances in this case that Bank One

representatives were fully aware that by Kaplan composing the above letter and giving it to Union Industrial, Bank One was actually providing and intending to provide Guarneros and His Companies with ability to consummate the sale to Quebecor without any payment to Goss on the balance due it or on its lien rights on the Printing Press.

120. On January 18, 2002, Adams, as agent for Editorial Comercial, Grupo Serla, Union Industrial, and Sergio Guarneros, came to Chicago and took the original Grupo Serla Note, the Repurchase Note, the Note Repurchase Agreement, and the Pledge from O'Connor's firm, Sachnoff & Weaver (the Chicago lawyers for Guarneros and His Companies as well as Union Industrial). (Pl.Ex. 110.)

121. Adams took the originals and went to St. Louis to deliver them to Guarneros. (Pl.Ex. 129, Adams Dep., 107.) Guarneros then took the originals to Mexico. *Id.*

122. Adams confirmed that he delivered the original Grupo Serla Note and Pledge to Guarneros, not to Union Industrial:

Q. Now, it says that you as agent for Editorial Comercial, Grupo Empresarial Serla and Union Industrial Mexicana and Sergio Guarneros acknowledge receipt on this 18th day of January, 2002 of the following original documents, copies of which are attached hereto.

Do you see that?

A. Yes, sir.

Q. And did you get those originals on that date?

A. Yes, sir.

Q. And these are true and accurate copies of those?

A. Yes, sir.

(Pl.Ex. 129, Adams Dep., 106.)

Adams continued:

My memory is, which is strong on this one, is that Bill O'Connor and Sam Tenenbaum had been in contact with the Mexican attorneys. This information had been, they had the originals in some suit that was here in Illinois. And so they wanted me to sign for the originals because in Mexico you can't take duplicates. You have to have originals. So I picked up the originals, they put in it [sic] an envelope, I went to St. Louis, gave it to Sergio. And then Sergio took it to Mexico with him.

(Pl.Ex. 129, Adams Dep., 106–107.)

123. Bank One representatives were fully aware that Goss filed for bankruptcy protection at the time that Bank One sold the Grupo Serla Note to Union Industrial. (R. Kaplan, 9/26/05, Test. 94.)

### Bank One Admitted Goss Possessed Contractual Rights

124. A Bank One witness admitted at trial that Goss possessed contractual rights under the Note Repurchase Agreement. (M.Page, 9/30/05, Test. 49.) Specifically, this Court asked Page:

Q: Did you view—did the bank view or you as its lawyer view Goss as having contractual rights under this agreement?

A: Goss?

Q: Yes.

A: Oh, yes . . .

(M.Page, 9/30/05, Test. 49.)

### Bank One Continued Its Collection Efforts On The Repurchase Note After The Bankruptcy Filing

125. After Goss filed for bankruptcy protection, Bank One continued to send past due notices to Goss requesting that Goss wire transfer funds regarding the

payments due on the Repurchase Note. (A. Salas, 10/18/05, Test. 44.)

126. Salas, a Bank One employee, sent these notices on behalf of Bank One in an effort to obtain payments from Goss, including "penalty interest." (A.Salas, 10/18/05, Test. 45–46.) Salas testified that Bank One treated debtors who filed for bankruptcy protection the same as those who had not. (A.Salas, 10/18/05, Test. 46.) Upon this Court's inquiry, Salas testified:

Q: Madam, were you ever given instruction as part of your work at the bank as to how to treat debtors who were in bankruptcy?

A: No, sir.

Q: So basically are you saying in your experience once someone filed bankruptcy, they received from Bank One the same sort of notices they would receive if they were outside of bankruptcy?

A: Yes, sir.

Q: And there was no practice of seeking permission of the court to send such notices?

A: Not that I'm aware of, no.

(A.Salas, 10/18/05, Test. 46.)

### Bank One's Proof Of Claim Contained Penalty Interest

127. As of November 19, 2001 there was $62,798.41 of penalty interest due on the Repurchase Note. (A.Salas, 10/18/05, Test. 51.)

128. On November 21, 2001, Bank One filed its proof of claim in the amount of $1,499,055.03. (Pl.Ex. 74.) The proof of claim lists $1,425,495.12 in principal and $73,559.91 in interest. (Pl.Ex. 74.)

129. On November 8, 2001, Salas, the Bank One employee who sent past due invoices to Goss, notified Kaplan that two installments of $757,293.98 and $678,962.64 were still past due. (Pl.Ex. 65.) Kaplan replied, "Company filed for bankruptcy, but we are working with Grupo Serla to get paid." (Pl.Ex. 65.) When Salas specifically asked Kaplan whether she should send past due notices to both Goss and Grupo Serla, Kaplan responded, "Sure." (Pl.Ex. 65.)

130. Goss did not make any payment to Bank One as a result of these notices. (A.Salas, 10/18/05, Test. 73.)

131. As soon as a Bank One attorney informed Salas that she should not send any further notices, she did not send any further notices. (A.Salas, 10/18/05, Test. 76, 78–79.)

132. The word "demand" did not appear in the notices. (A. Salas, 10/18/05, Test. 62, 75, 79; Pl. Exhs. 52, 63.)

133. On November 8, 2001, Bank One sent a Fourth Past Due Invoice to Goss requesting that $678,962.64 be wire transferred to Bank One. (Pl.Ex. 63, BO 3633.) Also on November 8, 2001, Bank One sent a Seventh Past Due Invoice to Goss requesting that $757,293.98 be wired transferred to Bank One. (Pl.Ex. 63, BO 3632.)

134. On November 8, 2001 Bank One calculated the Penalty Interest Due for the "Past Due Loans" and sent the same to Dan Dillman, a Goss executive. (Pl.Ex. 64.) The penalty interest totaled $59,447.14 as of November 8, 2001. (Pl. Ex. 64, BO 3625.)

135. Statements of fact contained in the Conclusions of Law shall constitute additional Findings of Fact.

### CONCLUSIONS OF LAW

#### JURISDICTION

Jurisdiction over this proceeding lies pursuant to 28 U.S.C. 157 and 1334(b) in that the matters raised herein arise under Title 11 U.S.C. and are related to a case under Title 11. Reference of the matters and issues herein were made to the bankruptcy court under District Court Internal Operating Procedure 15(a).

Portions of this action are core proceedings pursuant to 28 U.S.C. 157(b)(2), while related jurisdiction lies over other portions. To the extent any issue is not a core proceeding, all of the Defendants by their counsel consented under 28 U.S.C. section 157(c) that the Bankruptcy Court may not only hear but also decide and enter final judgment on related jurisdiction counts following trial. (Bank One's Revised Post–Trial Proposed Findings of Fact and Conclusions of Law, 33, ¶ 4; citations to Bank One's Revised Post–Trial Proposed Findings of Fact and Conclusions of Law will hereinafter be referred to as "BO PT Findings, __"; Trustee's Amended Final Argument, 41, ¶ 4.) Counsel for the Foreign Defendants consented orally on the record.

Venue for this Adversary Proceeding lies in this District under 28 U.S.C. § 1409(a).

Bank One and Goss agreed that the Repurchase Note is governed by Illinois law. (Pl.Ex. 21.) The also agreed to waive trial by jury in any judicial proceeding involving, directly or indirectly, any issue in any way arising out of, related to, or connected with the Repurchase Note or with the relationship established thereunder. *Id.* The Mexican Defendants did not demand trial by jury or assert, argue or brief any rights under Mexican law, but argued their case under cited Illinois precedents and statutes. The Pretrial Order provided that issues not argued would be deemed waived, and therefore any issues under Mexican law have been waived.

## I. *Goss Did Not Own The Note When Bank One Sold It*

### A. *The Note Repurchase Agreement Did Not Transfer Ownership Of The Grupo Serla Note To Goss Or Define An Ownership Therein*

■ After a series of negotiations regarding the balance due under the Grupo Serla Note (R. Kaplan, 9/26/05, Test. 49), on December 15, 2000, Goss and Bank One entered into the Note Repurchase Agreement. Goss agreed therein to pay the remaining 85% of the buyer's obligations under the Grupo Serla Note through delivery of a promissory note payable to Bank One (the "Repurchase Note") in the amount of $5,675,495.12. (Pl.Ex. 21.)

The Trustee relies on language in the Note Repurchase Agreement for support that Goss owned all or part of the Grupo Serla Note, specifically the following: (1) two recital clauses in the Note Repurchase Agreement to that effect; (2) a characterization of the "effective" provision in the agreement; and (3) an inference that Goss' delivery of the Repurchase Note should be treated as actual and immediate full payment for the Grupo Serla Note.

The Note Repurchase Agreement consists of one page. The relevant portions of it provided:

> Whereas, the Company has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of US$805,000 plus accrued interest;

> Whereas, the Bank has demanded that the Company repurchase the remaining 85% of the Grupo Serla Note by paying the Bank the principal amount of US$4,564,500 plus interest through December 15, 2000 in the amount of US$1,110,995.12;

> NOW, THEREFORE, in consideration of the mutual promises and covenants as expressed herein, and good and valuable consideration, the Parties hereto agree as follows:

> (1) The Company shall repurchase the remaining 85% of the Grupo Serla Note from the Bank in accordance with the

terms of the note attached hereto as Exhibit A (the "Repurchase Note").

(2) Upon the Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent shall otherwise direct.

(3) This Agreement shall become effective upon the later to occur of (I) the execution of counterparts hereof by the Parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the Company ...

(Pl.Ex. 21.)

The first recital relied upon by the Trustee, that Goss "has repurchased 15% of the Grupo Serla Note from the Bank by paying the Bank the principal amount of U.S. $805,000 plus accrued interest ...," does not mean that Goss owned 15% of the Note.

■ First, the operative provisions of an agreement supercede an inconsistent recital. Obligations and promises of parties in the operative portion of the contract prevail over a preliminary recital or preamble. *Brookens v. Peabody Coal Co.*, 11 Ill.2d 322, 143 N.E.2d 25, 27 (1957); *Ill. Housing Dev. Auth. v. M–Z Constr. Corp.*, 110 Ill. App.3d 129, 65 Ill.Dec. 665, 441 N.E.2d 1179 (1982) (holding that the preliminary recitals of an agreement impose no binding obligations on the parties unless so referred to in the operative portion of the instrument as to show a design they should form a part of it).

■ Evidence concerning the meaning and correctness of a recital contained in an integrated agreement is admissible and does not constitute improper parol evidence, as contrary facts may be proved. Restatement (Second) of Contracts § 218(1) (1981). *See also* Restatement (Second) of Contracts § 218(1) cmt. b (1981).

■ Illinois courts have held that "whereas" clauses serve as recitals and are merely explanations of the circumstances surrounding the execution of the contract. *Regnery v. Meyers*, 287 Ill.App.3d 354, 360, 223 Ill.Dec. 130, 679 N.E.2d 74 (1997). "These recitals are not binding obligations unless referred to in the operative portion of the contract." *McMahon v. Hines*, 298 Ill.App.3d 231, 237, 697 N.E.2d 1199, 1204, 232 Ill.Dec. 269, 274 (1998) (comparing *Regnery*, 287 Ill.App.3d at 360, 223 Ill.Dec. 130, 679 N.E.2d 74) ("whereas" clause merely a recital paragraph, the terms of which are not part of contract), with *Brady v. Prairie Material Sales, Inc.*, 190 Ill. App.3d 571, 577, 137 Ill.Dec. 857, 546 N.E.2d 802 (1989) (holding that recital paragraphs were part of agreement because operative clause stated that the preceding terms of the agreement were not a mere recital).

In the circumstances surrounding execution of the Note Repurchase Agreement, the recital was material only insofar as it recounted how much Goss paid to date with respect to its recourse obligations under the Grupo Serla Note. Page of Bank One testified that the wording of the recital was only a convenient shorthand the parties had developed for referring to the more complicated repayment transaction undertaken pursuant to Goss' endorsement of the Grupo Serla Note and Article V(A)(2) of the Note Purchase Agreement, i.e., the operative contract provisions. (M.Page, 9/30/05, Test. 40.)

The Trustee's contention based on the second whereas clause cited was that "the Bank has demanded that the Company [Goss] repurchase the remaining 85% of the Grupo Serla Note...." However, that

clause did not address the date that the repurchase was to be completed. It merely described the demand that Goss honor its recourse obligation under the Note Purchase Agreement. As described above, Paragraph 2 of the Note Repurchase Agreement specifically provides that the repurchase was not to be complete and Goss was not entitled to return of the Grupo Serla Note until "the Bank's receipt in full in immediately available funds of all amounts due and payable by [Goss]...." (Pl.Ex. 21.)

The operative provisions of the Note Repurchase Agreement between Goss and Bank One evidenced no intent to transfer ownership of the Grupo Serla Note to Goss as of its execution. Rather, they provided for Goss to make payments over time, in accordance with a schedule of payments, and they did not provide for endorsement and delivery of the Grupo Serla Note to Goss until after "Bank One's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note." (Pl.Ex. 21.)

Evidence of the negotiations was introduced, and fully supports this interpretation. Kaplan and Page of Bank One and Gaynor of Goss testified that Bank One and Goss intended only to extend the time for Goss to satisfy its remaining recourse obligations and did not intend to change any other aspect of the Note Purchase Agreement. (J. Gaynor 10/18/05, Test. 49; R. Kaplan 9/26/05, Test. 95.) Drafts of the Note Repurchase Agreement and Repurchase Note exchanged between the parties corroborate this testimony. (*See* BO Exhs. 59, 66.)

■ Parol or extrinsic evidence is admissible to explain the purpose of the execution of a written instrument, what the parties intended, the consideration for its execution, and the circumstances surrounding its execution. *Lincoln Nat'l Life Ins. Co. v. Horwich,* 115 F.2d 892, 895–96 (7th Cir.1940); *Dancy v. William J. Howard, Inc.,* 297 F.2d 686, 688 (7th Cir.1961); *Cinquegrani v. IRS (In re Cinquegrani),* Nos. 89 B 7850, 89 A 0747, 1993 WL 134752, at *7 (Bankr.N.D.Ill. Feb.1, 1993).

■ The Illinois Supreme Court long ago also observed that nothing in the parol evidence rule prevents a court from considering facts surrounding the execution of the agreement in question. *See Linn v. Clark,* 295 Ill. 22, 128 N.E. 824, 828 (1920) (the parol evidence rule does "not exclude evidence of the circumstances of the execution of the contract and of the facts in connection with it which may tend to explain its meaning by showing the situation of the parties and all their relations to one another and the subject matter of the contract.").

■ Pursuant to Illinois law, the primary goal in construing a contract is to give effect to intent of the parties. *Cress v. Recreation Services, Inc.,* 341 Ill.App.3d 149, 277 Ill.Dec. 149, 795 N.E.2d 817, 838 (2003). *See also First Bank and Trust Co. of Illinois v. Village of Orland Hills,* 338 Ill.App.3d 35, 39, 272 Ill.Dec. 485, 787 N.E.2d 300, 304 (2003); *Pennsylvania Life Insurance Co. v. Pavlick,* 265 Ill.App.3d 526, 529, 202 Ill.Dec. 424, 637 N.E.2d 1160, 1162 (1994).

As the trial testimony of the parties' representatives did not contradict or add any term to the operative provisions of the Note Repurchase Agreement, it was not necessary to demonstrate an ambiguity in order to introduce evidence of the negotiations and circumstances surrounding its execution.

The Note Repurchase Agreement and Repurchase Note did not give Goss an ownership interest in the Grupo Serla Note because they merely extended the

time for Goss to make payments of its pre-existing recourse obligation under its indorsement and the Note Purchase Agreement. As noted, Paragraph 2 of the Note Repurchase Agreement specifically provided that Goss was not to be entitled to possession of the Grupo Serla Note until Goss made all of its outstanding payments due to Bank One:

> Upon the ***Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company*** under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent jurisdiction shall otherwise direct.

(Tr. Exh. 21.) (emphasis supplied).

The Trustee argues that the Note Repurchase Agreement became effective the week of December 15, 2000 because that is when Bank One received the agreement executed by Goss. Therefore, the Trustee argues as a matter of law that the Grupo Serla Note was property of the estate when Bank One endorsed, delivered, and sold it to Union Industrial. (Trustee's Amended Final Argument, 43, ¶ 10.)

Contrary to Trustee's assertion, paragraph three of the Note Repurchase Agreement, which discusses when the agreement was to become effective, does not prove that Goss owned all or any part of the Grupo Serla Note when it delivered the Repurchase Note to Bank One. Paragraph 3 provides: "[t]his Agreement shall become effective upon the later to occur of (i) the execution of counterparts hereof by the parties and (ii) the receipt by the Bank of the Repurchase Note duly executed by the company." (Pl.Ex. 21.) This clause demonstrates that the parties intended to ensure that Bank One received what Goss promised to give to the Bank, an executed promissory note for $5,675,495.12, before

extension of the time for Goss to pay off its recourse obligations with respect to the Grupo Serla Note became effective.

At the time of entry into the Note Repurchase Agreement, the credit insurance claim had been denied and Goss failed to make immediate and full payment of its recourse obligations to Bank One both under its endorsement and the Note Purchase Agreement. The Note Repurchase Agreement upon becoming effective would relieve Goss of its default, but Bank One wanted to be clear (and Goss consented) that this relief would not take place until Bank One received the required executed documents. The fact that the Note Repurchase Agreement became "effective" did not mean that Goss had completed its repurchase of the Grupo Serla Note. Rather, it meant that the agreed-upon extension of time for Goss to pay was effective, and that Goss' immediate obligation to pay the remaining balance on the Grupo Serla Note to Bank One under the Note Purchase Agreement was suspended. The Note Repurchase Agreement, consistent with the original Note Purchase Agreement, by its explicit terms makes clear that Goss was not entitled to return of the Grupo Serla Note until it repaid the amount of the Grupo Serla Note in full. (Pl.Ex. 21.)

**B.** ***Other Evidence Did Not Show Under Illinois Law That Goss Was Partial Owner Of The Grupo Serla Note***

 Goss did not own 15% of the Grupo Serla Note because of its payment to Bank One of 15% of the amount of the notemakers' default. Goss did not acquire a partial ownership interest under the Note Purchase Agreement or applicable law. U.C.C. § 3–203(d) as adopted in Illinois provides: "If a transferor purports to transfer less than the entire instrument,

negotiation of the instrument does not occur. The transferee obtains no rights under this Article and has only the rights of a partial assignee." 810 ILCS 5/3–203(d) (2005).

 In this case, a partial assignment did not take place. The distinguishing feature of a partial assignment is a manifestation of intent to: (1) make an immediate transfer of part of but not all of the assignor's right; and (2) confer on the assignee a direct right against the obligor to the performance of that part. Restatement (Second) of Contracts § 326 cmt. b (1981). The factual question presented to determine whether a partial assignment took place is whether it was contemplated that there would actually be an outright assignment of some right, interest, and authority and control of a claim, or only a promise to pay out of any proceeds of a claim that might be collected in the future. Restatement (First) of Contracts § 156 cmts. a-c (1932); *Cf.* Restatement (Second) of Contracts § 326 cmt. b and § 330 cmt. b (1981).

No partial assignment took place as a result of Goss' repayment of a portion of the buyer's obligations because the evidence did not show that the parties manifested an intent to make an immediate transfer and assignment of part, but not all, of Bank One's rights to enforce the Grupo Serla Note. *See* Restatement (Second) of Contracts § 326 cmt. b (1981).

The Trustee has also not satisfied the second requirement for a partial assignment under Illinois law. He did not establish that Goss had the right to enforce any interest in the Grupo Serla Note directly against Grupo Serla and Editorial Commercial, the makers of the Grupo Serla Note. The Note Repurchase Agreement did not give Goss any rights vis-à-vis those two companies.

It is clear, moreover, that no partial assignment took place because Bank One retained possession of the Note and control of the claim and authority to collect on the claim and Note. Goss recognized this fact when it received the only payment made by Grupo Serla, $75,000 in October 1998. Notwithstanding that it had previously repaid 15% of the Buyer's obligations in default in September 1998, Goss forwarded the entire payment to Bank One without claiming that it was a 15% owner of the Grupo Serla Note and therefore entitled to 15% of the payment. *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 558–59 (2d Cir.1976); *Winterstein v. CrossCheck, Inc.*, 149 F.Supp.2d 466, 470–71 (N.D.Ill.2001).

Based on the facts in this case, no partial assignment took place and Goss did not obtain the rights as a partial assignee through the payments it made to Bank One.

C. *Goss' Delivery Of The Repurchase Note Does Not Demonstrate That The Repurchase Was Completed*

 The Trustee's additional argument that Goss' delivery of the Repurchase Note to the Bank constituted immediate and actual full payment to the Bank for the Grupo Serla Note is contrary to the legal presumption that a promise is not to be regarded as payment. It is well settled in Illinois law that mere delivery of a promissory note by a debtor for a preexisting obligation will not be held to extinguish the preexisting obligation in the absence of an agreement to that effect. *Keller v. North American Life Ins. Co.*, 301 Ill. 198, 204–05, 133 N.E. 726, 729 (1921). This "doctrine proceeds on the obvious ground that nothing can be justly considered as payment in fact but that which is in truth such, unless something else is expressly agreed to be received in its place. That a

mere promise to pay cannot of itself be regarded as an effective payment is manifest." *Keller*, 133 N.E. at 729.

 More recently on this point, it has been observed that "[a] note cannot be paid and satisfied by a new promise which goes unfulfilled." *American Nat'l Bank & Trust v. Dozoryst*, 256 Ill.App.3d 674, 679, 195 Ill.Dec. 608, 628 N.E.2d 1072, 1076 (1993). Consequently, Goss' mere delivery of the Repurchase Note did not discharge the obligation of Goss to make immediate full payment to the Bank before it was entitled to gain possession and ownership of the Grupo Serla Note. Full actual payment of its recourse obligations to Bank One was always the condition that Goss had to satisfy to become the owner of the Grupo Serla Note.

No evidence introduced by the Trustee rebuts the legal presumption that the delivery of the Repurchase Note did not extinguish Goss' obligations under the Note Purchase Agreement and should not be treated as actual and immediate full payment. The Note Repurchase Agreement did not rebut the presumption because paragraph 2 of that agreement makes it clear that Bank One would endorse and deliver the Grupo Serla Note only upon Bank One's receipt of payment in full in immediately available funds of all amounts due and payable by Goss under the Repurchase Note. (Pl.Ex. 21.)

In summary, the delivery of the Repurchase Note did not discharge Goss' obligation to make immediate full payment to the Bank before it was entitled to gain ownership of the Grupo Serla Note. Full actual payment of its recourse obligations to Bank One was always the condition that Goss had to satisfy to become the owner of the Grupo Serla Note, and none of the evidence proffered by the Trustee alters this.

### D. Bank One's Collection Efforts Do Not Prove that It Recognized That Goss Owned The Grupo Serla Note

Prior to the Note Repurchase Agreement, Bank One attempted to collect payment due on the Grupo Serla Note from Guarneros and His Companies. After the Note Repurchase Agreement has given, Bank One stopped demanding payment from Guarneros and His Companies and started sending bills to Goss with the same frequency.

The Trustee argues that this occurred because Bank One understood that Goss owned the Grupo Serla Note after the Note Repurchase Agreement. Despite the Trustee's argument, Bank One's collection efforts in this regard do not prove that it acknowledged Goss owned the Grupo Serla Note. Rather, Bank One was attempting to collect on the Grupo Serla Note from parties obligated under the Note. Despite Bank One's attempts from 1997 until 2000 to collect on the Note, it was unsuccessful. Bank One then focused its collection efforts on Goss as Goss was required to make payments to Bank One pursuant to its secondary liability. Therefore, Bank One's collection efforts do not prove it acknowledged Goss owned the Grupo Serla Note.

### E. Bank One's Internal Computer System Does Not Prove That Bank One Understood Goss Owned The Grupo Serla Note

The Trustee argues that Bank One's internal records confirm that Bank One acknowledged Goss had repurchased the Grupo Serla Note. Bank One maintains a computer system, referred to as the LS2 System, which keeps track of historical events. (A.Salas, 10/18/05, Test. 53.) The LS2 System reflected that on December 15, 2000 the Grupo Serla Note was paid off

and a new commitment representing the Repurchase Note was set up. Therefore, the Trustee argues that Bank One's internal records confirm that Bank One understood that Goss repurchased the Grupo Serla Note.

Salas, the Bank's record-keeper for this transaction, testified that the Bank's computer system mandated this approach because only one note per deal could be entered on the system. Maintaining the notes in this manner ensured that Bank One avoided double-counting of its assets. (A. Salas 10/18/05, Test. 66–67.) This action was not specific to this transaction but part of Bank One's normal process. Such administrative minutiae does not support the Trustee's position. A creditor's internal procedures do not define a bankruptcy debtor's property interests.

## II. *Goss Property Interest In Note And Impairment Thereof By Stay Violation*

### A. *Although It Did Not Own All Or Part Of The Grupo Serla Note, Goss Owned Interests Therein Constituting Property Of The Estate*

Bank One always recognized that Goss had an interest in the Note even though the Bank held title to and possession of that Note. The two parties even joined together with same counsel to sue the foreign Defendants in pleadings that recognized the interests of each. (Findings of Fact, ¶ 37.)

Section 541(a) of the Bankruptcy Code provides that the "estate is comprised of all the following property, wherever located and by whomever held ... all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1). The Supreme Court views this not as a limitation of what is included in the estate but as a broad,

inclusive definition. *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 103 S.Ct. 2309, 2312, 76 L.Ed.2d 515 (1983).

"When a bankruptcy petition is filed, virtually all property of the debtor at that time becomes property of the bankruptcy estate." *In re Yonikus*, 996 F.2d 866, 869 (7th Cir.1993). "[T]he term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *In re Yonikus*, 996 F.2d at 869 (citing *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966)). "[E]very conceivable interest of the debtor, future, non-possessory, contingent, speculative, and derivative, is within the reach of § 541." *In re Yonikus*, 996 F.2d at 869 (citing *In re Anderson*, 128 B.R. 850, 853 (D.R.I. 1991)).

The Bankruptcy Code does not provide a definition for either the term "property" or the term "interest in property." However, those terms should be construed extremely broadly, encompassing virtually every right that a debtor has at the time of filing. *See, e.g., Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 515, 15 L.Ed.2d 428 (1966).

Congress intended to bring "anything of value" into the estate. "[T]he Supreme Court has determined that property of the estate includes property in which the debtor had no possessory rights at the time the bankruptcy petition was filed." *In re Nash*, 228 B.R. 669, 672 (Bankr.N.D.Ill.1999).

Property accruing to the estate under 11 U.S.C. 541 includes all rights of action the debtor may have arising from contract. Collier on Bankruptcy, 541.08[4] (15th ed. rev.2005). Claims arising from contracts entered into by the debtor before

filing for bankruptcy have been held to be within the reach of 541. *Hoseman v. Weinschneider*, 277 B.R. 894, 899 (N.D.Ill. 2002) (noting that for a contract claim to be part of the estate, there must have been a contract, something that could have been enforced and assigned or otherwise alienated or levied against; mere negotiations will not suffice). To the extent that a contract is in existence at the filing of a bankruptcy petition, the underlying contract rights become property of the estate. *In re Sherlock Homes of W.N.Y., Inc.*, 246 B.R. 19, 23 (Bankr.W.D.N.Y.2000).

Based on the foregoing precedent and the broad application of 11 U.S.C. § 541, it is clear that Goss possessed several interests in the Grupo Serla Note that constituted property of the estate. Pursuant to the Note Repurchase Agreement, prior to the sale by Bank One to Union Industrial Goss had a right to obtain and own the entire Grupo Serla Note upon completion of its payment obligations due to Bank One. Goss possessed this contractual right pursuant to the Note Repurchase Agreement which provided:

> Upon the Bank's receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note, the Bank shall endorse and return the Grupo Serla Note to the Company or as a court of competent jurisdiction shall otherwise direct.

(Pl.Ex. 21.)

Prior to filing for bankruptcy, Goss made payments to Bank One in the amount of $5,175,728.17 pursuant to its obligations under the Note Repurchase Agreement. Goss made all of the payments due from it except the April and May 2001 payments. (M.Page, 9/30/05, Test. 44.) The April and May 2001 payments totaled $1,425,495.12. Therefore, Goss had the contract right to own and

possess the Grupo Serla Note by paying Bank One the relatively small balance due. Goss' contractual right to complete its repurchase of the Grupo Serla Note therefore constituted property of the bankruptcy estate.

Bank One recognized that Goss possessed contractual rights. Its representative admitted at trial that Goss possessed contractual rights in the items sold to Union Industrial. Specifically, Page, Bank One's lawyer who testified in these proceedings admitted:

> THE COURT: Did you view—did the bank view or you as its lawyer view Goss as having contractual rights under this agreement?
> THE WITNESS: Goss?
> THE COURT: Yes.
> THE WITNESS: Oh, yes . . .

(M.Page, 9/30/05, Test. 49.)

■ Goss possessed this contractual right both before and after its bankruptcy filing as its rights under the Note Repurchase Agreement were never terminated by any notice or assertion from Bank One. Moreover, it does not appear from the documents that its rights were automatically terminated by nonpayment as time of payments due was not specified to be "of the essence."

■ "When time is not of the essence, a failure to perform in the time specified does not terminate the parties' rights under the contract, and does not preclude recovery on the contract." 17A Am.Jur.2d *Contracts* 607 (2006). "Ordinarily, time is not of the essence unless made so by express stipulation of the parties or by virtue of the exigencies of the transaction itself." *See King v. Stevenson*, 445 F.2d 565, 569 (7th Cir.1971). In this case, the Note Repurchase Agreement did not expressly provide that time was of the essence. Nor should it be found that time

of payments was of the essence based on the proven intent of the parties or exigencies of the transaction. *See Id.* Because time was not of the essence and the Note Repurchase Agreement was not formally terminated by notice, Goss' still maintained the previously described contractual rights in the Grupo Serla Note post-bankruptcy.

In addition, the several requests for payment sent to Goss post-petition, as late as November 8, 2001, demonstrated that Bank One treated the Note Repurchase Agreement as an active contract. (Pl.Ex. 63.) Those reminders of monies due corroborated that the contract was still alive and showed that bank officials knew that contract was alive.

In addition to Goss' previously described contract rights in the Grupo Serla Note, under IL ST CH 26 ¶ 3–412, Goss had the right to payment on the Grupo Serla Note from the maker to the extent of its payments to Bank One. *See Primus Auto. Fin. Servs., Inc. v. Otto–Wal, Inc.,* No. 3:98CV7424, 2000 WL 621176, at *14 (N.D.Ohio Apr.3, 2000). For each payment Goss made to Bank One as endorser under Article 3 and as a party secondarily liable under the Note Purchase Agreement, Goss acquired the immediate right to sue the makers of the Grupo Serla Note for reimbursement. U.C.C. § 3–412 ("The obligation [of the issuer to pay an instrument according to its terms] is owed to a person entitled to enforce the instrument [defined in § 3–301] *or to an endorser who paid the instrument under Section 3–415 "*) (emphasis added); IL ST CH 26 ¶ 3–412. Goss, by virtue of its payments to Bank One, became entitled to repayment from Editorial and Grupo Serla, the issuers of the note. *See Primus Auto. Fin. Servs., Inc. v. Otto–Wal, Inc.,* No. 3:98CV7424, 2000 WL 621176, at *14

(N.D.Ohio Apr.3, 2000). IL ST CH 26 ¶ 3–412 provides:

> The issuer of a note or cashier's check or other draft drawn on the drawer is obliged to pay the instrument (i) according to its terms at the time it was issued or, if not issued, at the time it first came into possession of a holder, or (ii) if the issuer signed an incomplete instrument, according to its terms when completed, to the extent stated in Sections 3–115 and 3–407. The obligation is owed to a person entitled to enforce the instrument or to an endorser who paid the instrument under Section 3–415.

 Furthermore, Goss and later the Trustee could have become entitled to full rights of subrogation including the right to all collateral had they tendered or attempted to tender the remaining payments due the holder of the Grupo Serla Note. "Generally speaking, the party subrogated acquires all the rights, securities, and remedies the creditor has against the debtor who is primarily liable. His right of subrogation, although not superior to the rights of the original creditor, extends to the latter's rights, both direct and incidental." 73 Am.Jur.2d *Subrogation* § 61 (2006).

Based on the foregoing, Goss' various rights constituted property of the estate as defined in the Bankruptcy Code, 11 U.S.C. § 541.

### B. *Violation Of The Automatic Stay By Bank One*

 Finding that Goss' interests in the Grupo Serla Note constitute property of the estate, it is necessary to determine whether its interests in the Grupo Serla Note were altered in a manner in violation of the relevant provisions of 11 U.S.C. 362(a) through the Bank's sale of the Note to Union Industrial.

Upon the filing of a bankruptcy petition, the automatic stay arises as a matter of law. 11 U.S.C. § 362(a). Section 362(a) lies at the heart of the Bankruptcy Code. It provides one of the most fundamental protections afforded to debtors by preventing the piecemeal destruction of the debtor's property. Without the stay provided by 11 U.S.C. 362(a), there would be a race to the courthouse to claim assets of the debtor, and a successful reorganization would be impossible.

Section 362(a)(3) states that a filing of a petition for relief under the Bankruptcy Code serves as an automatic stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. 362(a)(3). "The stay of section 362 is extremely broad in scope and ... applies to almost any type of formal or informal action taken against the debtor or the property of the estate." Collier on Bankruptcy, 362.03 at 362–12.12 (15th ed. rev.2005).

Section 362(h) provides damages for "willful" violations of the stay.[3] 11 U.S.C. § 362(h). A willful violation of the stay does not require that the creditor had the specific intent to violate the stay. *In re Bloom*, 875 F.2d 224, 227 (9th Cir.1989). A creditor can be subject to liability under § 362(h) if the creditor engages in conduct which violates the automatic stay, with knowledge that a bankruptcy petition had been filed. *In re Roete*, 936 F.2d 963, 965 (7th Cir.1991).

Willfulness can be found even if the creditor believed himself justified in taking the actions found to violate the stay. *In re Sumpter*, 171 B.R. 835, 843 (Bankr. N.D.Ill.1994). Moreover, ignorance of

bankruptcy law does not excuse anyone involved in a willful violation. When a willful violation of the stay is found, the Bankruptcy Code allows the debtor to recover damages including attorney's fees and costs necessarily and reasonably incurred by reason thereof. *In re Alfred Fridge*, 239 B.R. 182, 190 (Bankr.N.D.Ill. 1999).

By applying the foregoing to the present case, it is evident that Bank One knowingly violated the automatic Bankruptcy stay by taking steps that wiped out Goss' interest in the Grupo Serla Note. At the time Goss filed for bankruptcy protection, Goss' estate possessed a protectable interest in the Grupo Serla Note, which Bank One disregarded and severely impaired or entirely destroyed.

Bank One argues that sale of its right, title, and interest in the Grupo Serla Note and related documents to Union Industrial did not violate the automatic stay because: (1) Bank One did not sell property of the estate; and (2) irrespective of who owned the Grupo Serla Note, Bank One did not impair or foreclose any right or interest of the estate, since the estate retained the same rights after the sale as before. (BO PT Findings, 33, ¶ 6.)

Bank One's arguments fail. Goss' interest in the Grupo Serla Note was altered in a manner contrary to relevant provisions of 11 U.S.C. 362(a) through the sale to Union Industrial. As was extensively discussed, Goss' interest in the Grupo Serla Note constituted property of the estate. Goss obtained an interest in the Grupo Serla Note based on its payments to Bank One.

Further, Bank One did impair an interest of the estate, Goss' interest in the

---

3. In 2005, the Bankruptcy Code was substantially revised, and § 362(h) was modified and relabeled § 362(k)(1). This opinion will refer to the section as § 362(h) as the prior version of the statute controls this case.

Grupo Serla Note, because Goss did not retain the same rights after the sale as before. Prior to Bank One's sale of the Grupo Serla Note to Union Industrial, Goss had the potential to collect from the makers of the Grupo Serla Note. Evidence presented at trial demonstrates that the possibility of Goss recovering from the makers of the Note was tangible. However, once Bank One sold the Grupo Serla Note, Goss lost the opportunity to collect from the makers or guarantor in Mexican courts where its litigation to collect had already lost because it did not possess the Note. Pursuant to Section 7.1 of the Amended and Restated Note Purchase Agreement, the Buyer (Union Industrial) denied that Goss had any rights in the Grupo Serla Note. (Pl.Ex. 106, BO 02819–20.) Further, after the sale to Union Industrial, the location of the Grupo Serla Note was unknown. Therefore, the estate clearly did not retain the same rights in the Grupo Serla Note after Bank One sold it to Union Industrial as it possessed no rights after the sale.

Bank One argues that it preserved Goss' property interest in the Note in connection with sale of its bankruptcy claim to Union Industrial. However, instead of passively retaining possession of the Grupo Serla Note, Bank One exercised control by affirmatively taking the Note and endorsing, transferring physical possession, and selling the same to an entity Bank One knew was related to the makers of the Note.

Bank One's sale of the Grupo Serla Note and related items did not merely maintain or continue the perfection of an interest in property. Bank One sold the Grupo Serla Note after Goss paid Bank One $5,175,728.17 pursuant to the Note Repurchase Agreement. Bank One negotiated a sale with the makers of the Grupo Serla Note without providing notice to Goss. Bank One then handed the Grupo Serla Note along with the security documents to the lawyers for the makers of the Note while Goss was even then attempting to enforce its rights in the Mexican Pledge Proceedings. It thereby interdicted the plan of some Foreign Defendants to pay $2.7 million to Goss to pay off its lien, a sum more than sufficient to enable Goss to pay the balance due from it to Bank One and thereby release the Note that entitled it to payment from the Foreign Defendants.

Bank One effectively sold and delivered the original Grupo Serla Note and the original Pledge Agreement to the lawyer who represented not only Union Industrial, but Grupo Serla, Editorial Comercial, and Guarneros as well. Clearly these actions were done in willful violation of the automatic stay.

## C. *Bank One Did Not Preserve Goss' Rights In The Sale To Union Industrial*

Bank One argues that the sale of the Grupo Serla Note to Union Industrial did not foreclose Goss' rights in the Grupo Serla Note, as Union Industrial agreed to honor all of Goss' rights against Bank One. (BO PT Findings, 76–77, ¶ 115.) Bank One also argues that it did not transfer property of the estate because it transferred only its own right, title and interest in the Grupo Serla Note and related documents to Union Industrial. (BO PT Findings, 52, ¶ 52.) According to Bank One, it "ensured that the estate's rights were preserved in the sale of the Bank's interest in the Grupo Serla Note to Union Industrial." (BO PT Findings, 52, ¶ 53.)

Bank One cites to Sections 2.1 and 2.2 of the Amended and Restated Note Purchase Agreement between Bank One and Union Industrial to support its argument. Section 2.1 provided:

2.1 Assets to be Conveyed. Subject to the terms and conditions of this Agreement at Closing (as hereinafter defined), Lender shall endorse and assign to Buyer, or as Buyer directs, and Buyer shall purchase and accept from Lender, all of Lender's right, title and interest in and under the Serla Note, the Guaranty, the Repurchase Note, the Note Purchase Agreement, the 2000 Agreement, and the Claim, and any and all other related rights and loan documents (such assets being conveyed are hereinafter collectively referred to as the "Purchased Assets").

(Pl.Ex. 106, 2.1, BO 02810.)

Pursuant to Section 2.2 of the Amended and Restated Note Purchase Agreement, Bank One asserts that Union Industrial explicitly assumed all of Bank One's obligations under the Grupo Serla Note and other items sold. Section 2.2. provided:

2.2 Obligations to be Assumed. Subject to the terms and conditions of this Agreement, with effect on and after the date of the Closing (as hereinafter defined), Buyer assumes and agrees to perform and comply with the obligations that Lender may have under the Serla Note, the Guaranty, the Repurchase Note, the Note Purchase Agreement, the 2000 Agreement, and the Claim, as well as under any and all loan and security documents.

(Pl.Ex. 106, § 2.2, BO 02810.)

However, the same Agreement demonstrates that Bank One knew that Union Industrial maintained that Goss possessed no rights before it sold the Grupo Serla Note:

7.1 Preservation of Goss' Recourse. Neither this agreement nor any action taken hereunder shall impair or affect in any way any rights, claims, or remedies, if any, Goss may have against Editorial, Serla, and/or Sergio Eduardo Guarneros Trujillo. Any such rights of Goss shall continue the same as if this Agreement had not been made or consummated. **Notwithstanding (but without limitation of) the foregoing, Buyer, on behalf of itself, all affiliates, successors and assigns, denies that Goss has any such rights and reserves all of their respective rights to deny or otherwise contest that Goss has any such rights.**

(Pl.Ex. 106, BO 02819–20.) (emphasis supplied).

Bank One argues that paragraph 7.1 only relates to Goss' rights against Editorial Comercial, Grupo Serla, and Guarneros, and by its terms it does not relate to or limit Union Industrial's unconditional undertaking to assume and perform and comply with Bank One's obligations regarding the Grupo Serla Note in Section 2.2.

This explanation, however, is contrary to evidence presented at trial. It is undeniable that Union Industrial is an entity related to Guarneros and His Companies and with the Note in their hands and out of the country, Goss could not assert any rights against the Foreign Defendants after the Note sale to Union Industrial. Further, Goss would no longer be able to obtain possession and ownership of the Grupo Serla Note upon completion of its repayment obligations so as to be able to enforce its rights in the Note. Therefore, Goss would never have the legal ability to seek payment on the Note from the Foreign Defendants. It was disingenuous in the first place for Bank One to pretend to protect Goss without bringing is lawyers into the negotiation. Moreover, Bank One knew that by selling the Grupo Serla Note to an entity related to the makers of the Note Goss' rights would be destroyed, not preserved.

It is clear from the plain language in the Amended and Restated Note Purchase Agreement that Bank One knew that Union Industrial denied that Goss had any rights before the Bank signed the Union Industrial Note Purchase Agreement and endorsed and delivered the Grupo Serla Note and the Pledge to the lawyer for Guarneros and His Companies.

Even if there were some substance to the fiction that Bank One sought to protect Goss' rights, purporting to preserve an interest when selling property of a bankruptcy estate is not sufficient to avoid finding a violation of the automatic stay. *See, e.g., In re Bialac,* 712 F.2d 426, 432 (9th Cir.1983) (noting that while the sale of the debtor's one-sixth interest in the note attempted to preserve his interest, "it would be more consistent with the best interests of the debtor and all creditors if the division of property in which the debtor had a fractional interest is under the auspices of the trustee in bankruptcy."). Bank One was fully aware that the Amended and Restated Note Purchase Agreement would affect the debtor's rights in the Grupo Serla Note while the automatic stay was in effect and never sought court approval or even informed Goss of sale contract terms before it acted.

Facts in this case are similar to those in *In re Bialac,* 712 F.2d 426 (9th Cir.1983). In *In re Bialac,* it was held that the pre-foreclosure right of debtor who had an interest in a note to redeem that entire note was a property right entitled to automatic stay protection. 712 F.2d 426 (9th Cir.1983). Therefore, a violation of the automatic stay was found when debtor's right of redemption was diminished by a post-bankruptcy foreclosure by the secured creditor. *Id.* More specifically, the post-petition act in *In re Bialac* that violated the stay was a foreclosure sale by the secured creditor on the five non-debtors'

interests in the pledged note and not the debtor's interest. However, foreclosure of the interests of non-debtors violated the stay because it altered and diminished the debtor's right of redemption; whereas prior to foreclosure the debtor could have paid $450,000 to redeem the entire note, afterwards he would have to pay $300,000 to protect only his interest.

Bank One argues that *In re Bialac* is distinguishable from the instant case on two grounds. First, that it did not foreclose on the pledged Grupo Serla Note but merely assigned its interest in the Note subject to Goss' rights and second, that the transaction with Union Industrial did not diminish Goss' right of redemption but preserved it. (BO PT Findings, 65, ¶ 85.) It argues that Goss could redeem and recover possession of the Grupo Serla Note for the same amount, i.e., the unpaid balance of the Note Repurchase Agreement (approximately $1.5 million at the time of the Bank's assignment to Union Industrial) after the sale to Union Industrial. *Id.*

Despite Bank One's arguments (similar to those of the debtor in *In re Bialac*), Goss' right to obtain possession and ownership of the Grupo Serla Note was not preserved. Prior to the sale to Union Industrial, Goss would have to pay Bank One $1,425,495.12 plus accruing interest to redeem, obtain possession and ownership of the Grupo Serla Note. After the sale to Union Industrial, the purchaser denied that Goss possessed any rights in the Grupo Serla Note despite its payments to Bank One totaling $5,175,728.17. Moreover, the Grupo Serla Note was taken to Mexico where its location is currently unknown. Goss could not redeem and obtain possession of a note whose whereabouts were and are unknown by the parties involved. It is certainly clear that Goss was deprived of its rights to redeem and obtain

the Grupo Serla Note from Bank One and use it to sue the parties liable.

### D. *Goss' Treatment Of The Grupo Serla Note And The Note Purchase Agreement In Its Earlier Confirmed Chapter 11 Case Does Not Preclude The Trustee's Contention Of Goss' Interest*

■ On July 30, 1999, Goss filed a Chapter 11 proceeding in Delaware, Case No. 99–2756. In that proceeding, Goss filed its sworn and attested bankruptcy schedules. In those schedules, Goss listed the Note Purchase Agreement as an executory contract. In its answer to No. 14 of Schedule B entitled "Personal Property," Goss did not list any interest in the Grupo Serla Note. (BO Ex. 46, KE 001223.) Goss' Schedule D entitled "Creditors Holding Secured Claims" reflects Bank One as a secured creditor only with respect to a secured bank lending syndicate and not in any individual capacity holding the Grupo Serla Note as collateral. (BO Ex. 162, KE 000192.)

These bankruptcy schedules were filed on September 23, 1999, approximately one year after Goss paid the last of two payments under the Note Purchase Agreement that the Trustee now contends resulted in Goss' acquisition and ownership of 15% of the Grupo Serla Note. Goss' Chapter 11 plan in the Delaware reorganization proceeding was confirmed on November 4, 1999, but was not submitted into evidence.

Bank One argues that the Trustee is precluded by doctrine of *res judicata* from claiming an ownership interest in the Grupo Serla Note. As discussed above, Goss did not own the Grupo Serla Note, but rather possessed interests in it. Moreover, Goss is not barred by *res judicata* from asserting an ownership interest in the Grupo Serla Note as a result of its former Chapter 11 plan.

■ Courts do indeed promote the goal of finality in reorganization proceedings through appropriate application of the doctrine of res judicata. *Eubanks, M.D. v. FDIC*, 977 F.2d 166, 169 (5th Cir.1992). However, Seventh Circuit precedent requires that the following three elements be satisfied for a claim to be precluded pursuant to the doctrine of *res judicata:* (1) an identity of parties or their privies; (2) an identity of the causes of action; and (3) a final judgment on the merits. *See D & K Properties Crystal Lake v. Mut. Life Ins. Co. of N.Y.*, 112 F.3d 257, 259 (7th Cir. 1997). Not one of these elements is satisfied based on the facts of this case.

■ The first element, identical parties or their privies, is not present. To justify preclusion under a theory of privity, a nonparty must have actual control. To have control of litigation requires that a person have effective choice as to legal theories and proofs to be advanced on behalf of the party to the action. *Benson and Ford, Inc. v. Wanda Petroleum Co.*, 833 F.2d 1172, 1174 (5th Cir.1987) (quoting *Hardy v. Johns–Manville Sales Corp.*, 681 F.2d 334, 339 (5th Cir.1982)). In this case, the Trustee did not have control of the 1999 Debtor or its schedules. He did not control or participate in the prior bankruptcy proceedings. Moreover, as a representative of the estate in this case, the Trustee does not represent the same interests as the 1999 Chapter 11 Delaware Debtor.

The second element, an identity of the causes of action, is also not satisfied in this case. Bank One argues that this element is satisfied because the operative facts on which the Trustee bases his ownership contention are the same as those that existed prior to commencement of the Delaware reorganization proceeding; that is two payments made by Goss in 1998 pur-

suant to the Note Purchase Agreement which occurred before the commencement of the Delaware Chapter 11 proceeding on July 30, 1999.

■ That argument is flawed. No prior cause of action existed. Goss' treatment of the Grupo Serla Note in its 1999 bankruptcy schedules did not constitute a cause of action. "A claim has 'identity' with a previously litigated matter if it emerges from the same 'core of operative facts' as that earlier action." *Lester v. Brown*, 929 F.Supp. 291, 294 (N.D.Ill. 1996); *see also People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 177 (7th Cir.1995) ("[I]dentity exists where there is a 'single core of operative facts giving rise to a remedy.' "). The issue in this case was not previously litigated as no prior cause of action existed. Therefore, the second element is not satisfied.

The third element, a final judgment on the merits, is also not satisfied. While Bank One cites authority for the proposition that an order confirming a plan of reorganization is given the same effect as a district court's judgment on the merits for claim preclusion purposes, in this case there is no evidence to suggest that a settlement or final judgment was reached regarding Goss' interests in the Grupo Serla Note in Goss' first bankruptcy case. Goss' confirmed Chapter 11 plan was not entered into evidence. This Court is thus left to speculate as to the plan provisions and the position that Goss took with respect to its interests in the Grupo Serla Note. Therefore, the Trustee is not now barred by the doctrine of *res judicata* from taking a position contrary to the one Goss took in its 1999 confirmed Chapter 11 reorganization proceeding.

■ The facts in this case also fail to support application of the doctrine of judicial estoppel. That doctrine applies to preclude a party from assuming a position

in a legal proceeding inconsistent with one previously asserted. One cannot determine from the evidence presented that Goss previously assumed a position in a legal proceeding (the prior bankruptcy case) inconsistent with the one asserted in this case, as neither Goss' earlier Chapter 11 plan nor any order relating to the plan was entered into evidence.

### E. *Bank One Gained An Advantage Over Other Creditors Post–Petition*

■ The purposes of the automatic stay are: (1) to protect the debtor from its pre-petition creditors by stopping "all collection efforts, all harassment, and all foreclosure actions" and (2) "to protect all creditors by ensuring that the estate will be preserved against attempts by other creditors to gain an unfair advantage with respect to the payment of claims." *Knopfler v. Glidden Co. (In re Germansen Decorating, Inc.)*, 149 B.R. 517, 521 (Bankr. N.D.Ill.1992).

■ "[T]he stay also protects creditors by preventing the dismemberment of the estate by other creditors seeking to gain an unfair advantage over their peers." *Id.* "One of the principal means by which bankruptcy law operates is to concentrate, in a single forum, disputes affecting a debtor's solvency and continuing operations." *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir.1994) (citing *Covey v. Commercial National Bank of Peoria*, 960 F.2d 657, 661–62 (7th Cir.1992); *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186 (7th Cir.1989); *In re Iowa R.R.*, 840 F.2d 535 (7th Cir.1988); *Boston & Maine Corp. v. Chicago Pacific Corp.*, 785 F.2d 562 (7th Cir.1986)).

"Aggregation prevents efforts by creditors to pick off or affect the disposition of assets in ways that may be privately bene-

ficial but collectively harmful. The bankruptcy judge then serves as dispatcher, resolving the claims that are conveniently treated together while releasing others for decision in their original forums." *Nat'l Tax Credit Partners, L.P. v. Havlik*, 20 F.3d 705, 708 (7th Cir.1994) (citing 11 U.S.C. § 362(d); 28 U.S.C. § 157(b)(5), (c); *Pettibone Corp. v. Easley*, 935 F.2d 120 (7th Cir.1991)).

Bank One argues that it did not gain an advantage over other creditors post-petition because it did not obtain any of the Debtor's funds or foreclose any interest of the estate. Rather, Bank One argues that it merely sold its own interest to a third party which paid the funds to it, under an agreement that explicitly preserved the Debtor's rights.

To the contrary, Bank One moved deliberately and specifically to block Goss from recovering a large payment for its interest so that the Bank could receive a major payment. The meeting at Bank One where Bank One told counsel for Guarneros and His Companies that it owned the Grupo Serla Note, along with the subsequent negotiations with Guarneros and His Companies, were clearly attempts by Bank One to block any deal by Goss and gain an advantage over other bankruptcy creditors. At trial, a Bank One witness admitted that it reviewed the plan of reorganization and the information Goss provided regarding Bank One's claims. (M.Page, 9/30/05, Test. 57–58.) Bank One determined that it would receive "little or nothing" through the bankruptcy proceedings unless it sold the Grupo Serla Note, and determined to better its position through such a sale. (*See* Findings of Fact, ¶ 83.)

Within days of receiving requested information from Goss, Bank One initiated actions to sell the Grupo Serla Note. By selling the Grupo Serla Note to Union Industrial and blocking Goss' rights therein, Bank One was able to recover $1,100,000.00. Goss, however, despite paying Bank One $5,175,728.17 for its interest in the Grupo Serla Note, received nothing. Through its tactic, Bank One clearly received more than it would have received for its claim through Goss' bankruptcy. This is precisely the type of conduct that the automatic stay was meant to prevent.

Bank One prevented the type of aggregation of assets in bankruptcy required by law by selling the Grupo Serla Note in which Goss possessed an interest in to Union Industrial. Bank One's deliberate and intentional actions constitute a willful violation of the automatic stay.

### F. Bank One Acted In Violation Of The Automatic Stay Despite Its Assertion That It Acted Under A Claim Of Ownership To The Grupo Serla Note

Bank One argues that it did not violate the automatic stay when it assigned all of its right, title, and interest in the Grupo Serla Note to Union Industrial because Bank One believed it owned the note and thus acted under a claim of ownership. Bank One extensively cites *United States v. Inslaw* to support this argument. 932 F.2d 1467 (D.C.Cir.1991).

In *Inslaw*, the parties contracted prepetition for the debtor Inslaw, Inc. to provide and install software in some of the offices of defendant Department of Justice (the "Department"). As a result of a temporary contract modification, the Department received computer tapes containing the source and object codes for enhanced software and agreed to restrict use of that software to the offices covered by the original contract. Inslaw then filed for bankruptcy. One month later, the contract modification expired. After that, the Department installed the software in 23 more of its offices. Inslaw filed an Adversary Proceeding claiming that the Department

was in violation of the stay by continuing and expanding the use of its estate property (i.e., the enhanced software), without Inslaw's consent. *Inslaw*, 932 F.2d at 1468–70.

The bankruptcy court, affirmed by the district court, held in favor of Inslaw. The D.C. Circuit reversed and dismissed the complaint for lack of jurisdiction. The D.C. Circuit found that the debtor was trying to remedy pre-petition acts of fraud, bias or harassment allegedly on the part of the Department by asserting a stay violation. *Id.* at 1474. It was further found that Section 362(a) applies only after the bankruptcy filing, and the bankruptcy judge lacked jurisdiction to resolve the pre-bankruptcy contract dispute between Inslaw and the Department. *Id.* at 1474.

As to Inslaw's interests in computer tapes and the enhanced software installed as prior to the bankruptcy filing, it was held that they did not become property of the estate because as of the petition date the estate held no possessory interest over them and the Department held the property under a claim of ownership. It was reasoned:

As to these, Inslaw held no possessory interest when it filed for bankruptcy on February 7, 1985. Nor can it claim a possessory interest over them through the Code's turnover provisions, as could the debtor-in-possession in *Whiting Pools*, because, as Inslaw freely admits, the Department held possession of the copies under a claim of ownership (its view of the contract and Modification 12) and claimed the right to use enhanced PROMIS without further payment. It is settled law that the debtor cannot use the turnover provisions to liquidate contract disputes or otherwise demand assets whose title is in dispute.

*Id.* at 1472 (citations omitted).

The facts in *Inslaw* are quite dissimilar to those in this case. The Bank's claim of ownership was subject to Goss' interests. Goss possessed those rights and interests in the Grupo Serla Note earlier discussed as a result of paying Bank One $5,175,728.17, and the contractual provisions, and Bank One recognized that Goss possessed contractual rights in the Grupo Serla Note. (*See* Findings of Fact, ¶ 125.) Goss was only required to pay Bank One $1,425,495.12 more before it would have been entitled to full ownership and possession rights of the Grupo Serla Note, only a sixth of what Goss had already paid Bank One.

To act under the Bank's claim of ownership in this case had the effect of denying and foreclosing all of Goss' rights in the Grupo Serla Note. After Bank One sold the Grupo Serla Note to Union Industrial, Goss could no longer redeem the Note or pursue the Mexican Pledge Proceedings and could no longer attempt to collect from the makers of the Note.

Bank One's actions demonstrate that it knew it was impairing Goss' rights even before it sold to Union Industrial. While Bank One argues that it was legitimately acting under a claim of ownership, it did not apprise all interested parties of circumstances surrounding the sale prior thereto. Instead, Bank One sold the Note to Union Industrial without notifying Goss' creditors, requesting court permission, seeking relief from the automatic stay, or even providing Goss with a copy of the sale agreement.

Bank One also cites for support *In re Carousel Int'l Corp.*, 89 F.3d 359 (7th Cir. 1996). In that case, the trustee held $250,000 in escrow as to which the estate asserted a claim of ownership. The bankruptcy trustee ultimately settled the dispute agreeing that only $10,000 of the $250,000 should be retained as property of

the bankruptcy estate. The bankruptcy court issued an order approving the settlement and authorizing distribution of the escrowed funds to the shareholders subject to satisfaction of all liens. *Id.* at 360–61. The Trustee asserted that all of the funds were property of the estate pending resolution of how those funds would be distributed. *Id.* at 361. A Seventh Circuit panel opinion held that $240,000 was not property of the estate, as it was already determined that only $10,000 was property of the estate. *Id.* at 362. Therefore, the trustee did not have rights to the entire $250,000.

The facts in *In re Carousel Int'l Corp.* are distinguished from those here. In *Carousel*, the bankruptcy court issued an order approving a settlement in which it was agreed that only $10,000 of the total funds held in escrow was property of the estate. Therefore, it was found that the trustee could not assert a right of ownership to the entire amount of funds in escrow as it was determined that only $10,000 of the $250,000 was property of the estate.

For *Carousel* to be applicable here, a bankruptcy judge would have had to determine and define Goss' interests in the Grupo Serla Note, and Goss would then have to claim that some greater interest was property of the estate and thus protected by the automatic stay. Such did not occur in this case.

Unlike the facts in *Carousel*, there was no judicial determination of Goss' and Bank One's prospective interests in the Grupo Serla Note before Bank One sold it to Union Industrial. Instead, ignoring all of Goss' rights and interests, Bank One sold the Grupo Serla Note to Union Industrial. Bank One decided to protect itself at the expense of any rights that Goss may have had, and it did not seek a determination from the bankruptcy court that it

owned and possessed all rights to the Grupo Serla Note before it proceeded on its path of self-help.

While Bank One argues that it acted in good faith under claim of ownership to all rights in the Grupo Serla Note, that claim is irrelevant to whether it willfully violated the automatic stay. In determining whether a stay violation was willful, it is irrelevant whether the party believed in good faith that it had a right to the property at issue. *In re Ramirez,* 183 B.R. 583, 589 (9th Cir. BAP 1995) (multiple citations omitted). "Not even a good faith mistake of law or a legitimate dispute as to legal rights relieve a willful violator of the consequences of his act." *Id. See also Fleet Mortgage Group, Inc. v. Kaneb (In re Kaneb),* 196 F.3d 265, 268–69 (1st Cir. 1999); *In re Flack,* 239 B.R. 155, 162 (Bankr.S.D.Ohio 1999); *In re Steenstra,* 280 B.R. 560, 567–68 (Bankr.D.Mass.2002).

"A stay violation might still be a willful one if the actor misconstrues the scope of the automatic stay and its listed exceptions or otherwise believes he is justified, because a specific intent to violate the stay is not necessary." *In re Will,* 303 B.R. 357, 364 (Bankr.N.D.Ill.2003) (multiple citations omitted). Specific intent is not required for a finding of a willful violation of the automatic stay. It is sufficient that a party acted in violation of the automatic stay with knowledge of the pending bankruptcy case. *Price v. United States (In re Price),* 42 F.3d 1068, 1071 (7th Cir.1994). In this case, Bank One willfully violated the stay even if its agents believed it acted under a claim of ownership.

### G. *Bank One Did More Than Sell Its Claim To Union Industrial*

Bank One argues in the alternative that it merely sold its claim to Union Industrial and that Bankruptcy Rule 3001 allows the

assignment of claims. However, it did much more than sell its claim. Indeed, it is disingenuous for Bank One to argue it only sold its claim. The main purpose of the Amended and Restated Note Purchase Agreement was to sell the Grupo Serla Note, not a claim in bankruptcy.

The sale document between Bank One and Union Industrial is entitled the "Amended And Restated **Note Purchase Agreement**." (Pl.Ex. 106.) (emphasis supplied). The sale documents were not titled, "Amended And Restated Claim Sale Agreement."

Kaplan, the Bank One representative who negotiated the sale to Union Industrial, understood that Bank One sold the Grupo Serla Note and was unable to place any value on Bank One's claim versus the value that was placed on the Grupo Serla Note and/or other items sold. (R. Kaplan, 9/26/05, Test. 112–13.)

It was noted in the Bank One memorandum as to reasons warranting sale of the Note that claims were trading at 10% to 20% of face value. (Pl.Ex. 91.) Bank One's claim against the estate was for $1,425,495.12 plus accruing interest. Therefore, Union Industrial paid it far more than the value of Bank One's claim. Union Industrial did not bring a claim but rather bought out the Bank's interest in the Note so as to get it away from Goss.

While creditors are permitted to transfer a claim or interest against a debtors' estate to a third party without violating the stay, they are not permitted to sell property of the estate without seeking relief from the automatic stay. Bank One argues that it merely acted to protect its existing property interests and contract rights. Here, however, it is obvious that Bank One did far more by effectively blocking exercise of all of Goss' interests in the Grupo Serla Note so as to use its possession of the Note to obtain more than the bankruptcy case would have provided to it.

The reason Bank One did this is easy to discern. Kaplan testified that he was aware that Bank One would receive little if anything if it did not sell the items to Union Industrial that were sold under the Amended and Restated Note Purchase Agreement. (R. Kaplan, 9/26/05, Test. 120–21.) By selling them, it recovered more than it could have as a legitimate creditor in the bankruptcy case.

### H. *Bank One's Transmission Of Default Notices to Goss Did Not Violate The Automatic Stay*

Mere requests for payment unaccompanied by coercion or harassment are generally not viewed as violations of the automatic stay. *See, e.g., Morgan Guaranty Trust Co. of New York v. American Savings & Loan Assoc.*, 804 F.2d 1487, 1491 (9th Cir.1986), and cited with approval in *In re Duke*, 79 F.3d 43, 45 (7th Cir.1996). As the Seventh Circuit opinion stated in *Duke*, "[t]he Third Circuit [has] explained that the respite provided by § 362 'is not from communication with creditors, but from the threat of immediate action by creditors, such as foreclosure or a lawsuit.'" 79 F.3d at 45 (quoting *Brown v. Pa. State Employees Credit Union*, 851 F.2d 81, 86 (3d Cir.1988)). For there to be a stay violation, a request must have a coercive or harassing effect. *See id.*

"[M]ere presentment and other requests for payment unaccompanied by coercion or harassment are not barred by § 362(a)." *Cox v. Zale Delaware, Inc.*, 242 B.R. 444, 449 (N.D.Ill.1999) (citing *Murray v. Great Valley Savings Ass'n*, 89 B.R. 533, 534–37 (Bankr.E.D.Pa.1988)).

The Trustee has failed to offer any evidence that the many default notices sent by Bank One had a coercive or harassing

effect on Goss. Goss' bankruptcy estate did not make any payments in response to the notices. While Salas of Bank One acknowledged that she sent the notices for purposes of collection, neither Salas nor anyone else from Bank One contacted Goss to obtain payment, threatened Goss with foreclosure or a lawsuit, or did anything else to obtain payment. The notices thus did not have any coercive or harassing effect on Goss.

In the context of Bank One's other egregious violations of the automatic stay, to view such conduct as a potential violation of the automatic stay would trivialize the serious violations. (But as noted earlier, those notices recognized that the contract with Goss was alive and viable.)

## I. The Trustee Does Not Lack Standing To Bring Claims For Stay Violation

 Bank One asserts that the Trustee cannot recover damages on behalf of the estate as a matter of law because the estate is a corporate debtor and 11 U.S.C. § 362(h) provided that only an "individual" injured by a willful violation is entitled to damages and other relief under that section. *See e.g., Consolidated Rail Corp. v. Gallatin State Bank,* 173 B.R. 146 (N.D.Ill. 1992); *In re Midway Indus. Contractors, Inc.,* 178 B.R. 734 (N.D.Ill.1995); *In re Bequette,* 184 B.R. 327 (Bankr.S.D.Ill. 1995); *In re Shape, Inc.,* 135 B.R. 707 (Bankr.D.Me.1992).

However, § 362(h) permits a Chapter 7 Trustee to recover actual damages sustained by the individual bankruptcy estate as a result of a willful violation of the automatic stay. *Martino v. First National Bank of Harvey (In re Garofalo's Finer Foods, Inc.),* 186 B.R. 414, 439 (N.D.Ill. 1995). In *Martino,* the opinion reasoned that applying a more limited definition of "individual" would produce a result clearly at odds with Congress' presumed intent:

> [T]here are many situations in which a creditor willfully violates the automatic stay by acting to take possession of estate property. Under section 704(a), the trustee is obligated to recover the property for the benefit of the estate. *See* 11 U.S.C. § 704(a) (the trustee is required to "collect and reduce to money the property of the estate ...")." If the trustee incurs legal expenses in recovering such property and cannot recover his fees from the party that violated the stay, either the estate will be depleted by the amount of the trustee's costs of recovery or the trustee will not be reimbursed for those costs. Either of these results is clearly undesirable. By adopting a broader definition of "individual" (i.e., one based upon the second portion of the Black's Law Dictionary definition), the court avoids these undesirable results while at the same time ensuring that the goal Congress certainly sought to create (i.e., enforcement of the automatic stay) and the incentive it created to achieve that goal (i.e., the possible recovery of attorney's fees) are properly preserved. Thus, in the absence of clear language to the contrary, this court declines to apply the narrow definition of "individual" adopted by the bankruptcy court and the Ninth Circuit and instead finds that a chapter 7 trustee is an "individual" for the purposes of section 362(h).

 Section 362 provides that the automatic stay goes into effect upon the filing of a bankruptcy petition under any chapter of the Bankruptcy Code. The automatic stay applies to all debtors, including corporate debtors. "The automatic stay is the linchpin of the relief provided by the Bankruptcy Code and, thus, it is incumbent upon the bankruptcy court to vindi-

584

cate the application of the stay and to deter further violations." *In re Kirk*, 199 B.R. 70, 71 (Bankr.N.D.Ga.1996). If the Trustee were not allowed to bring actions against entities found to have violated the automatic stay and thereby harmed the bankruptcy estate, the automatic stay would be rendered meaningless as a protection as to corporate debtor property.

## J. The Trustee Can Recover Damages Against Bank One For Stay Violation

██ Section 362(h) of the Bankruptcy Code provides, "An individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(h). The Bankruptcy Code does not explicitly define the word "individual." *Consolidated Rail Corp. v. Gallatin State Bank*, 173 B.R. 146, 147 (N.D.Ill.1992). Many courts have held that the word "individual" should be interpreted narrowly thus precluding a debtor corporation from recovering under this provision. *Consolidated Rail Corp. v. Gallatin State Bank*, 173 B.R. 146 (N.D.Ill.1992); *In re Midway Indus. Contractors, Inc.*, 178 B.R. 734 (N.D.Ill.1995); *In re Bequette*, 184 B.R. 327 (Bankr. S.D.Ill.1995); *In re Shape, Inc.*, 135 B.R. 707 (Bankr.D.Me.1992).

Contrary authority has held that the word "individual" should not be limited to the literal sense, and that corporations and other entities injured by a willful violation of the stay may recover damages under § 362(h). *In re Atlantic Business and Community Corp.*, 901 F.2d 325 (3d Cir. 1990); *Budget Service Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir. 1986); *In re Academy Answering Service, Inc.*, 100 B.R. 327 (N.D.Ohio 1989). "According to this view, it is unlikely that

Congress meant to give a remedy to only individual debtors against those who willfully violate the automatic stay and not to debtors which are corporations or other entities, since such a narrow construction of the term 'individual' would defeat much of the purpose of the provision." 9B Am. Jur.2d *Bankruptcy* § 1763 (2006). It has also been found that applying the word "individual" in the literal sense would be contrary to the intent and purpose of the automatic stay as a whole, which is to protect property of the estate for benefit of all creditors. *Id.* (citing *In re Randy Homes Corp.*, 84 B.R. 799 (Bankr.M.D.Fla. 1988)).

Other courts have found that § 362(h) permits a chapter 7 trustee to recover actual damages sustained by the individual bankruptcy estate as a result of a wilful violation of the automatic stay. It has specifically been found that attorney fees incurred by the trustee in prosecuting such an action are a type of actual damages sustained by the estate. *Martino v. First National Bank of Harvey (In re Garofalo's Finer Foods, Inc.)*, 186 B.R. 414, 439 (N.D.Ill.1995); *See* 11 U.S.C. § 362(h); *In re Burke*, 147 B.R. 955, 959 (Bankr.W.D.Mo.1992) (finding that the trustee was damaged by defendant's willful violation of § 362(a)(3) in the amount equal to "the attorney fees expended to prosecute the instant action" and thereby permitted the trustee to recover those fees); *In re Omni Graphics, Inc.*, 119 B.R. 641, 645 (Bankr.E.D.Wis.1990) ("attorneys' fees and costs are, in and of themselves, a form of damages under section 362(h) which can be awarded in the absence of other actual damages.").

In *Martino*, it was found that the Trustee may be considered an individual for all purposes under § 362(h) entitled to recover damages. 186 B.R. 414 (N.D.Ill.1995). It was also found that the word "individu-

al" should be given a more expansive definition, thus "a chapter 7 trustee may properly be considered an 'individual' since the trustee always files an adversary action on behalf of an artificial entity (i.e., the bankruptcy estate) rather than in his individual capacity." *Id.* at 438. Because § 362(a) was intended to give all debtors broad protections for benefit of the bankruptcy estate and those entitled to it, it was opined that the definition of the word "individual" should be interpreted to allow a Chapter 7 trustee to recover damages under § 362(h). *Id.* at 437–39.

While courts are divided over whether a trustee may recover damages under § 362(h), a trustee can certainly recover damages in the exercise of this Court's civil contempt and equitable powers. "A bankruptcy trustee not entitled to recover damages under 11 U.S.C. § 362(h) may nonetheless recover damages in the form of costs and attorneys' fees under 11 U.S.C. § 105(a) as a sanction for ordinary civil contempt." 9B Am.Jur.2d *Bankruptcy* § 1763 (2006) (citing *In re Pace,* 67 F.3d 187 (9th Cir.1995)).

■■ A violation of the automatic stay is punishable as contempt of court. Collier on Bankruptcy, 362.11 (15th ed. rev.2005). Many opinions have found that while a corporate debtor cannot recover damages for creditor's violation of automatic stay under § 362, damages can nevertheless be awarded to a corporate debtor in exercise of the court's civil contempt and equitable powers. *In re Pace,* 67 F.3d 187, 194 (9th Cir.1995); *Johnston Environmental Corp. v. Knight (In re Goodman),* 991 F.2d 613, 620 (9th Cir.1993); *Jove Eng'g, Inc. v. IRS (In re Jove Eng'g, Inc.),* 92 F.3d 1539, 1554 (11th Cir.1996); *In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118, 124 (Bankr.N.D.Tex.2003).

"An award of damages in favor of a corporate debtor may provide an incentive for debtors to prosecute violations of the stay and for creditors to observe the limits imposed by the automatic stay. Similarly, civil contempt as a sanction may serve to insure compliance with the automatic stay or to compensate a debtor for losses or damages sustained because of a stay violation." *In re San Angelo Pro Hockey Club, Inc.,* 292 B.R. 118, 124 (Bankr.N.D.Tex. 2003).

■■■ The power of contempt is inherent in all courts, as the ability to enforce orders (in this case the statutory injunction called the automatic stay) is essential to the orderly administration of justice. *See Shillitani v. U.S.,* 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966). Section 105 of the Bankruptcy Code codifies the contempt power of bankruptcy courts and provides as follows:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action o making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a). "Section 105 grants broad powers to bankruptcy courts to implement the provisions of Title 11 and to prevent an abuse of the bankruptcy process." *In re Volpert,* 110 F.3d 494, 500 (7th Cir.1997).

■■ Civil contempt sanctions are designed for the dual purposes of compelling compliance with a court order and compensating the complainant for losses caused by contemptuous actions. *Tranzact Technologies, Inc. v. 1Source Worldsite,* 406 F.3d 851, 856 (7th Cir.2005). "The purpose of a civil contempt proceeding . . . is

remedial, with its purpose being either enforcement of a prior court order or compensation for losses or damages sustained as a result of noncompliance with the provisions of the order at issue." *Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 785 (7th Cir.1981).

■■■ Upon a finding of civil contempt, a court may, at its discretion, order reimbursement of the complainant, as part of the civil relief, of the party's fees and expenses incurred in bringing the violation to the court's attention. *Commodity Futures Trading Comm'n v. Premex, Inc.,* 655 F.2d 779, 785 (7th Cir.1981) (citations omitted). "It is within the trial court's discretion to award fees upon a finding of civil contempt." *Tranzact Technologies, Inc. v. 1Source Worldsite,* 406 F.3d 851, 856 (7th Cir.2005). The Trustee is thus entitled to damages including together with reasonable and necessary attorneys fees and costs based on Bank One's willful violation of the automatic stay in the exercise of this Court's civil contempt power.

### III. Trustee's Recovery Under U.C.C. § 9–207 And 11 U.S.C. § 549

#### A. Bank One's Sale Of The Grupo Serla Note To Union Industrial Also Breached Its Duty Imposed On A Secured Party Under U.C.C. § 9–207 And Illinois Precedent

■■■ Apart from violating the stay that protected Debtor's interests in the Note, Bank One also breached its duties under the Uniform Commercial Code.

When the makers of the Grupo Serla Note failed to pay the amounts due, Bank One demanded that Goss pay a portion of the buyer's obligations under the Grupo Serla Note. Goss, therefore, made payments to Bank One. Bank One held possession of the original Grupo Serla Note in order to secure Goss' further debt to Bank

One. As holder of that security, Bank One owed a duty to Goss to preserve the value of the same. Bank One's sale to Union Industrial for $1,100,000.00 breached this duty.

Bank One argues that it used reasonable care in the custody and preservation of the Grupo Serla Note because it insisted that the transferee—Union Industrial—agree to honor all of Bank One's obligations to Goss under the Grupo Serla Note. Bank One, however, knew that Union Industrial denied that Goss possessed any rights in the Grupo Serla Note, and knew that release of the Note and preventing Goss from recovering the Note made the assertedly protective contract language wholly meaningless. Bank One cannot make the good faith argument that it took reasonable care in preserving Goss' interests by requiring an ineffective clause in the sale agreement that was made meaningless by release of the Note.

■■■ The holder of collateral security is bound to exercise ordinary diligence to preserve the validity and pecuniary value thereof. It is clear that a pledgee who received instruments representing claims of the pledgeor against third persons was under a duty to use reasonable diligence to preserve and collect the claims or to enable the pledgeor to do so. Gary Spivey, *Duty of pledgee of commercial paper as to its enforcement of collection,* 45 A.L.R.3d 248, 1972 WL 31994, § 3 (The Lawyers Co-operative Publishing Company 2006).

The Uniform Commercial Code appears to preserve the common-law rule. *Id.* U.C.C. § 9–207 provides:

(a) Duty of care when secured party in possession. Except as otherwise provided in subsection (d), a secured party shall use reasonable care in the custody and preservation of collateral in the secured party's possession. In the case of chattel paper or an instrument, reason-

able care includes taking necessary steps to preserve rights against prior parties unless otherwise agreed. *See* 810 ILCS 5/9–207.

In construing this duty of care, courts from various jurisdictions have recognized that "at common law, and implicitly under the Uniform Commercial Code, a creditor may assign its rights and transfer possession of collateral without the knowledge or consent of the debtor, so long as the debtor's right to redeem upon payment of the debt is not impaired." *Harris v. Key Bank,* 193 F.Supp.2d 707, 717 (W.D.N.Y. 2002) (citing *Chittenden Trust Co. v. Marshall,* 146 Vt. 543, 547, 507 A.2d 965 (1986)). *See also McRae v. Vogler,* 272 Or. 230, 536 P.2d 509 (1975).

Bank One recognizes that under U.C.C. § 9–207(1) a secured creditor is required to use reasonable care in preserving the collateral, but fails to recognize that it did not take reasonable care in preserving Goss' rights in the Grupo Serla Note. It compromised with makers of the Grupo Serla Note by selling the Grupo Serla Note to Union Industrial, a company allied with the Foreign Defendants. Bank One did this despite the well-settled general rule that "one holding commercial paper as collateral security cannot, except perhaps in very extreme cases, compromise with the maker of the collateral, and surrender the same for less than the amount due thereon, and that if he does so, he will be bound to account to the pledgeor." *Rights of pledgeor of collateral note as affected by its transfer by pledgee to the maker,* 99 A.L.R. 26, II(a) (Thomson/West 2006).

Bank One concedes that case law construing a secured creditor's duty to preserve collateral both under the U.C.C. and prior to its enactment permits a secured party to sell its principal claim and assign its interest in a note pledged as security to the maker itself or a party related to the maker of the pledged note, only provided the debtor's right to redeem is preserved. (BO PT Findings, 104, ¶ 187.)

Bank One asserts that Goss' right to redeem the putative collateral, i.e., the Grupo Serla Note was preserved. Bank One, however, did not really preserve Goss' rights in the sale to Union Industrial. Prior to the sale, Goss had the right to obtain the Grupo Serla Note upon completion of its payment obligations. However, after the sale of the Grupo Serla Note to Union Industrial, the location of the Grupo Serla Note became unknown except that it had been taken into Mexico, and Goss lost all ability to use that Note in litigation.

Bank One is correct in asserting that Illinois law follows a general rule of assignability. *Bradley v. Parks,* 83 Ill. 169 (1876); *see Deane v. Fort Dearborn Trust & Sav. Bank,* 241 Ill.App. 517, 1926 WL 3901, at *4 (1926) ("There is no doubt about the rule that a pledgee has such a special interest in the pledged property that he can sell and assign his interest therein along with the original indebtedness"); *see also* 30 Ill. Law and Prac. Pledges § 33 ("In the absence of a contract providing otherwise, a pledgee may transfer or assign his interest under the contract of pledge. He has a special interest in the property pledged that he can sell and assign his interest therein along with the original indebtedness.").

This general common-law rule is consistent with the Uniform Commercial Code as adopted in Illinois. One of the purposes of that Code is to "encourage and facilitate commercial transactions by allowing parties to freely contract under uniform laws." *Wegner v. Grunewaldt,* 821 F.2d 1317, 1321 (8th Cir.1987) (rejecting proposed construction of U.C.C. that "would impair the transferability of secured property.").

Under non-bankruptcy law, rights and duties under a contract are generally freely assignable. However, there are exceptions to this rule. One exception is where the chance of obtaining return performance is materially impaired by the assignment. "In general, unless the parties have agreed otherwise, contract rights are freely assignable unless assignment would materially change the duties of the obligor, increase the obligor's risk, or impair the obligor's chance of obtaining return performance." *U.S. v. Doe*, 940 F.2d 199, 204–05 (7th Cir.1991). Bank One argues the rule with no recognition of that exception. In this case, it is clear that Bank One's alleged assignment was inconsistent with the general rule encouraging assignability because Goss' rights were impaired with result that it had no chance of "obtaining return performance."

### B. *Damages Recoverable For Bank One's Breach Of Its Duty Imposed Under U.C.C. § 9–207*

The "prima facie measure of damages in an action for the conversion of a promissory note is the amount which the maker of the note agreed to pay, and interest." *Rights of pledgeor of collateral note as affected by its transfer by pledgee to the maker*, 99 A.L.R. 26, II(d) (Thomson/West 2006). However, the amount of the pledgeor's debt to the pledgee is deducted in arriving at the amounts recoverable. Thus, it has been held that the pledgee is liable to the pledgeor for the full amount due on the collateral note, less what was due from the pledgeor to the pledgee. *Id.*

Pursuant to U.C.C. § 9–625 and 810 ILCS 5/9–625, Goss is entitled to damages based on Bank One's breach of its duty. Under 810 ILCS 5/9–625, Remedies for secured party's failure to comply with this Article, "Damages for noncompliance . . . a

person is liable for damages in the amount of any loss caused by a failure to comply with this Article."

In sum, even without reaching the automatic stay issues, the evidence presented requires judgment against Bank One for damages based on Bank One's breach of its duty imposed under U.C.C. § 9–207 as adopted in Illinois.

### C. *Trustee's Recovery Pursuant To 11 U.S.C. § 549*

In Plaintiff's First Amended Complaint, Plaintiff sought recovery under 11 U.S.C. § 549. Section 549(a) permits a trustee to void an unauthorized, post-petition transfer of property of the estate. 11 U.S.C. § 549(a). The trustee can then recover the property transferred (or, with court permission, its value) from the transferee. 11 U.S.C. § 550(a).

Avoidance under section 549(a) has four elements: (1) property was transferred; (2) the property was property of the bankruptcy estate; (3) the transfer occurred after commencement of the case; and (4) neither the bankruptcy court nor the Bankruptcy Code authorized the transfer. *Krol v. Wilcek (In re H. King & Assocs.)*, 295 B.R. 246, 291 (Bankr.N.D.Ill. 2003). "The burden of proof falls, not on the trustee seeking to avoid the transfer, but on the party claiming the transfer is valid." *In re Blair*, 330 B.R. 206, 213 (Bankr.N.D.Ill.2005); Fed. R. Bankr.P. 6001.

In this case, Bank One owned the Grupo Serla Note. Goss, however, possessed contractual rights in it and upon full payment, was entitled to full ownership and possession rights of the Grupo Serla Note. If the Trustee were successful in avoiding the transfer of the Grupo Serla Note to Union Industrial under § 549, Goss' recovery would be the rights of the estate that were transferred. This recovery would be im-

practical, as the location of the Grupo Serla Note is unknown. In addition, it would be extremely difficult to recover the interests that Goss had in the Grupo Serla Note from Union Industrial.

■■■ The Trustee, however, is nonetheless entitled to recovery in the form of damages based on Bank One's violation of the automatic stay and damages caused from Bank One's violation of the U.C.C. Pursuant to 810 ILCS 5/9–625, remedies for secured party's failure to comply with Article, "a person is liable for damages in the amount of any loss caused by a failure to comply with this Article ..." Bank One is therefore liable for damages in the amount of loss caused by its unauthorized transfer of Goss' rights in the Note post bankruptcy.

## IV. Bank One's Affirmative Defenses Fail

### A. Equitable Estoppel Does Not Bar The Trustee's Claim

■■■ The purpose of equitable estoppel is to prevent a party from benefitting from that party's contrary misrepresentation. *In re Griffin Trading Co.*, 270 B.R. 883, 901 (Bankr.N.D.Ill.2001); *Dupwe v. Wallace*, 355 Ark. 521, 140 S.W.3d 464 (2004). "[A] party is estopped merely by the fact of having alleged or admitted in his pleadings in a former proceeding under oath the contrary of the assertion sought to be made." *Id.* at 469. *See also In re McGunn*, 284 B.R. 855, 864 (Bankr.N.D.Ill. 2002) (a party cannot assert one position in a legal proceeding that is contrary to a position taken earlier in either the same or a related proceeding).

■■■ Bank One argues that the Trustee is estopped from claiming an ownership interest in the Grupo Serla Note because Goss as debtor-in-possession, and the Trustee as Plaintiff, have taken inconsistent positions. Namely, Bank One argues that Goss as a debtor-in-possession in two Chapter 11 proceedings did not list the Grupo Serla Note as an asset and thus should be estopped from asserting it in this case. Bank One also argues that the Trustee claimed for the first time in this lawsuit that Goss owned the Grupo Serla Note.

Equitable estoppel does not bar the Trustee's Claim. Debtor made numerous representations that it, in fact, owned the Grupo Serla Note. (Pl.Ex. 129, Adams Dep., 61; M. Page, 9/30/05, Test. 58; S. Guarneros, 10/5/05, Test. 89.) The Debtor was not silent on this point. Moreover, prior declarations by the Debtor are not admissible against the Trustee based on privity in this case. *Matter of L & S Industries Inc.*, 989 F.2d 929 (7th Cir. 1993).

### B. Goss And The Trustee Did Not Waive Any Right To Pursue Claims Against Bank One

■■■ Bank One argues that it disclosed the sale of its right, title, and interest in the Grupo Serla Note to Goss on multiple occasions and while Goss had every chance to redeem its interests, it chose not to. Further, at no time did Goss object to Bank One's sale to Union Industrial. Therefore, Bank One argues that Goss' failure to object or redeem its interests constitutes a waiver of the Trustee's claim that Bank One's conveyance of its right, title, and interest in the Grupo Serla Note constituted unlawful acts.

While Bank One may have informed Goss of a sale involving the Grupo Serla Note, it did not provide Goss with a copy of the sale agreement. Providing Goss with a copy of the agreement could have allowed Goss to view the conditions of the sale. Bank One failed to inform the bankruptcy court or any of Goss' creditors of

the sale. Bank One also failed to seek modification of the automatic stay. Goss may have been given written notice of the sale to Union Industrial (eight days by fax; seven days by overnight mail) but at no point was Goss made aware that it would lose all of its rights through the Bank's sale. Thus, Goss did not knowingly waive any right to pursue claims against Bank One.

## C. *The Trustee's Claims Are Not Barred By The Doctrine Of Laches*

Laches is established whenever a claimant unreasonably delays in pursuing its rights and harm is thereby caused to the other party. *Nancy's Home of the Stuffed Pizza, Inc. v. Cirrincione*, 144 Ill. App.3d 934, 98 Ill.Dec. 673, 494 N.E.2d 795, 800 (1986).

Bank One argues that a laches defense was created in its favor because, despite having notice, Goss sat on its hands during the period in which Bank One transferred its right, title, and interest in the Grupo Serla Note. However, it fails to acknowledge that Goss was never informed of critical circumstances and terms surrounding the sale to Union Industrial. Goss was not informed that its rights would be lost in the transaction because Bank One failed to provide Goss a copy of the sale agreement. In addition, the sale was executed without giving notice to creditors, the bankruptcy court, or seeking relief from the automatic stay. Goss did not delay in protecting its rights, as there was no reason to suggest that Goss' rights would be lost in the sale. The Trustee's claims are thus not barred by the doctrine of laches.

Even if Goss was fully aware that it would loss all rights in the Grupo Serla Note and took no action to protect its rights upon the sale to Union Industrial, Bank One would still be found in violation of the automatic stay. In addition to protecting the debtor, the automatic stay protects creditors by preventing the dismemberment of a debtor's assets by individual creditors levying on the property, thus promoting the bankruptcy goal of equality of distribution. Collier on Bankruptcy ¶ 362.03 (15th ed. rev.2005). Because the estate possessed rights in the Grupo Serla Note, Bank One should have served and filed a motion for relief from stay seeking permission from this Court to sell the Grupo Serla Note to Union Industrial. In doing so, Bank One should have complied with Rule 4001(a) which would have required Bank One to serve notice on all creditors' committees (or all creditors listed by the Debtor if there is no committee). Fed. R. Bankr.4001(a). Providing notice is the minimum protection that can be afforded interested creditors and other parties. *See Solow v. First America Bank (In re Papa's Market Cafe, Inc.)*, 162 B.R. 519, 523 (Bankr.N.D.Ill.1993). Bank One, however, failed to inform the Debtor that it would lose all rights once the sale was consummated and failed to provide notice to any other interested parties that it was selling estate property without seeking permission from this court.

## D. *Goss Did Not Fail To Mitigate Any Alleged Damages*

The doctrine of avoidable consequences requires the non-breaching party in a contract case to take reasonable steps to mitigate damages after the alleged breach and prohibits that party from recovering those damages which it should have acted to prevent. *Shearson Hayden Stone, Inc. v. Leach*, 583 F.2d 367, 370 (7th Cir.1978). Under the Illinois mitigation of damages doctrine, "an injured party is not allowed to recover from a wrongdoer those damages which the party should have fore-

seen and 'could have avoided without undue risk, burden or humiliation.' " *Grill v. Adams,* 123 Ill.App.3d 913, 79 Ill.Dec. 342, 463 N.E.2d 896, 902 (1984) (quoting Restatement (Second) of Contracts § 350(1) (1981)).

 Bank One argues that the Debtor and the Estate had a duty to mitigate any damages they incurred. Because the Debtor did not object to the impending sale of the Grupo Serla Note to Union Industrial, Bank One argues that Goss' inaction precludes the Trustee from prevailing for the full amount of his claim. Because Goss was not fully informed of all of the circumstances or terms surrounding the sale to Union Industrial, and had but a few days to react to the notice of sale, it cannot be held that it had a duty to mitigate damages. Therefore, Goss did not have an opportunity to mitigate damages and lacked the funds to do so because the Bank effectively interdicted the large checks prepared for Goss so that the Bank could benefit from those funds as it did.

## V. *Certain Claims By Trustee Fail*

### A. *The Trustee Is Not Entitled To Declaratory Relief*

 The Trustee's claim for declaratory relief is denied. Granting such relief would not serve any of the purposes of the Declaratory Judgment Act, 28 U.S.C. § 2201. *F.T.C. v. Bay Area Bus. Council, Inc.,* No. 02 C 5762, 2003 WL 21003711, at *4–5 (N.D.Ill. May 1, 2003); *Amari v. Radio Spirits, Inc.,* 219 F.Supp.2d 942, 944 (N.D.Ill.2002).

> The purposes of declaratory judgments are to clarify and settle the legal relations at issue and to terminate and afford relief from uncertainty, insecurity, and controversy giving rise to the proceeding. Where the substantive suit would resolve the issues raised by the

declaratory judgment action, the declaratory judgment action serves no useful purpose because the controversy has ripened and the uncertainty and anticipation of litigation are alleviated.

*Tempco Elec. Heater Corp. v. Omega Eng'g Inc.,* 819 F.2d 746, 749 (7th Cir. 1987).

Because the Trustee has sued on substantive claims and because the rights and interests of the parties will be determined through resolution of those claims, declaratory relief would serve no useful purpose. *Amari v. Radio Spirits, Inc.,* 219 F.Supp.2d 942, 944 (N.D.Ill.2002).

Further, Plaintiff is not entitled to a declaratory judgment providing that Goss was the "owner" of the Grupo Serla Note when it was not. While Goss certainly possessed interests in the Grupo Serla Note by virtue of the Note Repurchase Agreement, Goss was not entitled to possession or ownership of the Grupo Serla Note until it made its further payment due of approximately $1.5 million to cure its default or provided adequate assurance that the default would be cured. Because Goss did not do so, Plaintiff is not entitled to a declaration that Goss (and now Trustee) is owner of the Grupo Serla Note.

### B. *The Trustee Has Failed To Prove His Claim For Unjust Enrichment*

 The Trustee has failed to prove a claim for unjust enrichment. The doctrine of unjust enrichment underlies a number of equitable remedies, including constructive trust. *HPI Health Care Services, Inc. v. Mt. Vernon Hosp., Inc.* 131 Ill.2d 145, 160, 137 Ill.Dec. 19, 545 N.E.2d 672, 678 (1989). "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defen-

dant's retention of that benefit violates the fundamental principles of justice, equity and good conscience." *Id.* When a plaintiff seeks to recover a benefit that was transferred to the defendant by a third party, retention of the benefit is unjust where: (1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead; (2) the defendant procured the benefit from the third party through some type of wrongful conduct; or (3) the plaintiff for some other reason had a better claim to the benefit than the defendant. *See Id.* and cases cited.

■■ The Trustee argues that he is entitled to a claim for unjust enrichment against the Bank based on a wrongdoing, but fails to make a clear showing of wrongdoing. The Trustee's argues that Union Industrial paid $1,100,000.00 to Bank One "on the mistaken belief that Bank One owned the Grupo Serla Note." Goss did indeed have significant rights in the Grupo Serla Note, but Goss did not own the Grupo Serla Note.

The Trustee also argues that Goss had a better claim than Bank One to proceeds from sale of the Grupo Serla Note because Goss either owned the Grupo Serla Note outright (as a result of the Note Purchase Agreement) or was at least an equitable owner of a large percentage of the Grupo Serla Note when Bank One delivered and endorsed the Grupo Serla Note to Union Industrial. Thus, the Trustee argues that Bank One would be unjustly enriched by retaining the proceeds of the sale.

■■ However, Goss did not own the Grupo Serla Note at the time of the sale to Union Industrial. Goss possessed significant rights in the Grupo Serla Note as a result of its payments to Bank One and contract rights. But while Goss paid Bank One a significant amount of its repayment obligations, it did not complete its payments and therefore was not entitled to ownership and possession of the Grupo Serla Note. Thus, it has not been proved that Bank One was unjustly enriched by retaining the proceeds of the sale. A party is not unjustly enriched when it keeps the proceeds from the sale of its own interests. *See also Interlease Aviation Investors II (Aloha) L.L.C. v. Vanguard Airlines, Inc.,* No. 02 C 4801, 2004 WL 1149397, at *11–12 (N.D.Ill. May 20, 2004) (no unjust enrichment from recovery on own claim).

■■ Moreover, the claim of unjust enrichment is precluded because a plaintiff cannot pursue an unjust enrichment claim when there is an enforceable, express contract between the parties. *Cromeens, Holloman, Sibert, Inc. v. AB Volvo,* 349 F.3d 376, 397 (7th Cir.2003). *See also* 42 C.J.S. Implied Contracts § 5 (May 2006). "The doctrine does not operate to rescue a party from the consequence of a bad bargain, and the enrichment of one party at the expense of the other is not unjust where it is permissible under the terms of an express contract." *Id.*

Goss and Bank One were parties to an express contract. The Note Repurchase Agreement expressly provided that Goss would not be able to obtain possession or ownership of the Grupo Serla Note until payment in full on the Note Repurchase Agreement. Goss failed to complete its repurchase obligations. Therefore, an unjust enrichment claim is precluded.

This is in no way inconsistent with the rulings herein that the Bank harmed Goss' interests and thereby violated the stay, and also that it violated its duties under U.C.C. § 9–207. Those concepts prevail, but this one does not.

C. ***The Trustee Has Failed To Prove His Claim For A Constructive Trust***

■■ The Trustee's request for imposition of a constructive trust on the pro-

ceeds Bank One received from the sale and assignment of its interests to Union Industrial is denied. A constructive trust is one raised by operation of law. Absent coercion, duress, or mistake a constructive trust is generally imposed in only two situations: (1) where actual or constructive fraud is considered as equitable grounds for raising the trust; and (2) where there is a fiduciary duty and a subsequent breach of that duty. *See, e.g., Amendola v. Bayer,* 907 F.2d 760, 762–63 (7th Cir. 1990) (a constructive trust will not be imposed unless the claimant makes a showing of wrongdoing, such as fraud, breach of fiduciary duty, duress, coercion or mistake); *Davis v. Combes,* 294 F.3d 931, 936 (7th cir.2002) (same); *Bressner v. Ambroziak,* 379 F.3d 478, 483–84 (7th Cir.2004) (same).

■■■■ A constructive trust may also arise when duress, coercion or mistake is present. *Id.* "A constructive trust will be used to compel a party who unfairly holds a property interest or money to convey that property to the one to whom it justly belongs …" *A.T. Kearney, Inc. v. INCA Intern., Inc.,* 132 Ill.App.3d 655, 660, 87 Ill.Dec. 798, 477 N.E.2d 1326, 1332 (1985). A party "unfairly hold[s] property" when they would be "unjustly enriched if [he] were permitted to retain such property." *Id.* (citing *Zack Co. v. Sims,* 108 Ill.App.3d 16, 63 Ill.Dec. 732, 438 N.E.2d 663 (1982)).

■■■■ The grounds for imposing a constructive trust must be so clear, convincing, strong and unequivocal as to lead to but one conclusion. *Suttles v. Vogel,* 126 Ill.2d 186, 127 Ill.Dec. 819, 533 N.E.2d 901, 904–05 (1988) (citations omitted); *see also Davis v. Combes,* 294 F.3d 931, 936–37 (7th Cir.2002). As explained by the decision in *Davis,* some form of wrongdoing is a prerequisite to the imposition of a constructive trust. The Trustee's allegations of fraud are insufficient, as the Trustee has not presented evidence that the Bank engaged in fraudulent conduct. Moreover, Bank One was clearly not a fiduciary of Goss. Further, the unjust enrichment argument and contention that Goss owned the Note when it was sold have been rejected in earlier discussions.

■■■■ Finally, a constructive trust cannot be imposed post bankruptcy, as any rights thereto must have been found under nonbankruptcy law prior to filing of the bankruptcy petition. *In re Davenport,* 268 B.R. 159, 163 (Bankr.N.D.Ill.2001) (citing *In re CL Furniture Galleries, Inc.,* 95 C 50103, 1995 WL 756853, at *8 (N.D.Ill. Dec.20, 1995) (in order to prevail on theory of constructive trust, Debtor must have acquired a judicially imposed constructive trust prior to the filing of Debtor's bankruptcy petition)). The Trustee did not have a judicially imposed constructive trust as of the date of the bankruptcy filing; therefore, the imposition of a constructive trust on the proceeds from the sale is inappropriate. The Trustee's claim for the imposition of a constructive trust thus fails.

**D. *The Trustee Is Not Entitled To Proceeds Through A Resulting Trust***

■■■■ A resulting trust "is based upon the 'natural equity' that one who pays for property should enjoy it." *In re Estate of Koch,* 297 Ill.App.3d 786, 788, 232 Ill.Dec. 189, 697 N.E.2d 931, 933 (1998). A resulting trust is an "intent enforcing trust" which arises from the presumed intent of the parties. *In re Estate of Wilson,* 81 Ill.2d 349, 355, 43 Ill.Dec. 23, 410 N.E.2d 23, 26 (1980). "A resulting trust, unlike a constructive trust, seeks to carry out a donative intent rather than to thwart an unjust scheme. The general rule is that where a transfer of property is made to one person and the purchase price is

paid by another, a resulting trust arises in favor of the person by whom the purchase price is paid." *In re Crossroad Health Ministry, Inc.,* 319 B.R. 778, 780 (Bankr. D.D.C.2005) (citing Collier on Bankruptcy ¶ 541.11[3] at 541–67 (15th ed. rev.2003)); *United States v. Marx,* 844 F.2d 1303, 1309 (7th Cir.1988) (internal quotations and citations omitted).

 Under well established Illinois precedent, a resulting trust arises and vests, if at all, at the time legal title is taken by the asserted trustee. *Hanley v. Hanley,* 14 Ill.2d 566, 152 N.E.2d 879, 882 (1958). *See also In re Estate of McCormick,* 262 Ill.App.3d 163, 199 Ill.Dec. 502, 634 N.E.2d 341, 345 (1994); *Gary–Wheaton v. Meyer,* 130 Ill.App.3d 87, 85 Ill.Dec. 180, 473 N.E.2d 548, 555 (1984); *In re Sacramento Real Estate,* 201 B.R. 225, 233 (Bankr.N.D.Ill.1996). The burden of proof to establish such a trust is on the party claiming it, and the evidence must be clear and convincing; if doubtful or susceptible to other interpretations, the evidence is insufficient to show a resulting trust. *In re Davenport,* 268 B.R. 159, 163 (Bankr. N.D.Ill.2001).

 The Trustee argues that because Goss owned the Grupo Serla Note when Bank One sold it, Goss was and the Trustee is now entitled to sale proceeds through imposition of a resulting trust. This claim fails.

Bank One initially paid Goss the full face amount of the Grupo Serla Note and obtained ownership of it at that time subject to Goss' interest. When Goss made its repurchase obligation payments, it was paying amounts that it owed to Bank One pursuant to the Note Purchase Agreement. As earlier discussed, it did not then own the Note.

The Trustee alternatively argues that the Note Repurchase Agreement and Re-

purchase Note were equivalent to a real estate installment contract, such that it would be unfair to the estate if Goss did not receive an equitable interest in return for its payments. The real estate installment analogy is not applicable to the facts in this case.

Bank One originally provided $5,370,000.00 to or on behalf of Goss for the Grupo Serla Note. Bank One extended the financing with Goss' explicit agreement that it would remain secondarily liable on the Grupo Serla Note and would pay Bank One the outstanding balance on the Grupo Serla Note in the event the makers defaulted and the credit insurer denied coverage. Accordingly, from inception of the transaction, it was agreed that the risks of nonpayment by the makers and the credit insurer would fall on Goss, not on Bank One. This risk allocation is what induced Bank One to pay Goss $5,370,000.00 for the Grupo Serla Note.

The instant case is not analogous to some hypothetical real estate installment contract in which a court might find that a buyer, who had made substantial payments was equitable owner under the doctrine of equitable conversion. *See e.g., In re Streets and Beard Farm Partnership,* 882 F.2d 233, 235 (7th Cir.1989). In the installment contract case, the seller gives the buyer nothing before the parties enter into the transaction for the buyer to purchase the real estate. The seller in that situation promises that he will convey his consideration, title to the real estate, when buyer completes making all of the payments or a designated portion thereof. If that seller were allowed to keep both the real estate and all funds paid after the buyer makes substantial but not all payments, an injustice would result, so courts may fashion the remedy that Trustee urges here.

In this case, however, Bank One paid Goss $5,370,000.00 for the Grupo Serla Note, and Goss assumed the recourse obligation to repay the funds if the notemakers defaulted and the credit insurer denied coverage. Therefore, the equitable principles sometimes presented in real estate installment contract transactions are not applicable in this case.

## E. The Trustee Has Failed To Prove A Basis For Rescinding The Note Repurchase Agreement

"[R]ecission is available only when a contract is procured by fraud or misrepresentation, when it is based on a material mistake, or in the presence of substantial non-performance or breach of contract by a party." *Home Sav. Ass'n v. State Bank of Woodstock,* 763 F.Supp. 292, 296 (N.D.Ill.1991); *Taylor v. Bob O'Connor Ford, Inc.,* No. 97 C 0720, 1998 WL 177689, at *12 (N.D.Ill. Apr.13, 1998). The Trustee argues that Bank One, through its officers and lawyers, made representations to Goss that Goss had repurchased 15% of the Grupo Serla Note, and was required to repurchase the remaining 85% of the Grupo Serla Note. In selling the Grupo Serla Note to Union Industrial, Goss argues that Bank One sold a promissory note that Goss already purchased. Thus, Goss argues Bank One did not substantially perform its contractual rights under the Note Repurchase Agreement and that agreement should be rescinded and payments thereunder returned.

However, Bank One did substantially perform its obligations. Under the Note Repurchase Agreement and Repurchase Note, the only remaining performance required of Bank One—to endorse and return the Grupo Serla Note to Goss—was expressly conditioned on Bank One's "receipt of payment in full in immediately available funds of all amounts due and payable by the Company under or in connection with the Repurchase Note ..." (Pl.Ex. 21, Agmt. § 2.) It is undisputed that at no time before filing bankruptcy or thereafter did Goss make the final payments due under the Repurchase Note. The Trustee's assertion that Goss' delivery of the Repurchase Note to the Bank constituted immediate actual full payment to the Bank for the Grupo Serla Note is contrary to the legal presumption that a promise to pay is not to be regarded as payment, and was rejected in earlier discussions herein. As a result, Bank One never became obligated to perform under the Note Repurchase Agreement and was not required to deliver the Grupo Serla Note to Goss. *Coronet Ins. Co. v. Saez,* 151 Ill.App.3d 287, 104 Ill.Dec. 632, 502 N.E.2d 1292, 1295 (1986).

Further, because Goss itself was in default under the Note Repurchase Agreement, neither it nor its Trustee could seek to rescind the agreement. *W.H. Purcell Co. v. Sage,* 200 Ill. 342, 65 N.E. 723 (Ill.1902); 12A Ill. Law & Prac. Contracts § 375, at 216 (1983) ("A party to a contract may not take advantage of his own default to rescind the contract, nor may he rescind for breach of the contract by the other party if he himself is substantially in default.")

For these reasons, the Trustee's rescission argument fails.

## F. The Trustee's Assertion Of Claims For Tortious Interference With Contract And Tortious Interference With Prospective Economic Advantage Following Trial Was Waived

In the Trustee's final proposed Findings of Fact and Conclusions of Law submitted posttrial, the Trustee argued for the first time that Bank One tortiously interfered with the Agreement in Principal

[sic], dated June 25, 2001, between Goss and the Foreign Defendants. (Pl.Ex. 25.) The Trustee also asserted for the first time the claim that Bank One tortiously interfered with Goss' prospective economic advantage, arguing that Goss was to collect certain monies from Quebecor stemming from sale of Grupo Serla's assets to Quebecor (the claims will be referred to hereinafter as the "Alleged Interference Claims"). Notice of these claims was not given or pleaded in the Initial Complaint or the Amended Complaint filed May 19, 2005 (only four months before trial), nor were those claims discussed in the initial Trustee's Proposed Findings of Fact and Conclusions of Law submitted pretrial in accordance with this Court's Final Pretrial Order. At no time before or after trial did the Trustee ask leave of court to plead the Alleged Interference Claim.

The Trustee now argues that Bank One's post-petition actions in violating the automatic stay interfered with the potential recovery of $2,700,000.00 for Goss. He further argues that Bank One's actions in violating the automatic stay prevented Goss from receiving $5,000,000.00 from Quebecor, and wishes to argue that this stay violation was a tortious interference with the economic expectations of Goss.

 Final pretrial orders are designed to prevent unfair surprise and give parties an opportunity to fairly prepare for and defend against new claims. *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443–44 (7th Cir.1995) (noting that "[b]ecause the parties rely on the pretrial conference to inform them precisely what is in controversy, the pretrial order is treated as superseding the pleadings and establishes the issues to be considered at trial."). *See also In re Craig*, No. 03 A 4341, 2004 WL 1490427, at *1–3 (Bankr.N.D.Ill. June 29, 2004) (sanctioning debtor for failing to comply with final pretrial order); *SNA*

*Nut Co. v. Haagen–Dazs Co.*, 302 F.3d 725, 732 (7th Cir.2002) (holding that "a defense not raised in a pretrial order is deemed waived").

Since the whole purpose of pretrial conferences and orders "is to clarify the real nature of the dispute at issue, a claim or theory not raised in the pretrial order should not be considered by the fact-finder." *Gorlikowski v. Tolbert*, 52 F.3d 1439, 1444 (7th Cir.1995). As was further noted in *SNA Nut Co. v. Haagen–Dazs Co.*, "[w]hile this result may seem harsh, pretrial orders help to prevent protracted litigation due to changing theories and arguments such as those that we are encountering in this case." 302 F.3d 725, 732 (7th Cir.2002).

This Court's Final Pretrial Order, dated November 9, 2004, stated, "Any party not filing proposed Conclusions of Law or a brief may be found to have waived legal issues not thereby presented." Pursuant to that Order, the Trustee was required to at least give notice in advance of trial all grounds for relief sought.

Therefore, the Trustee's attempt to raise these new tort claims post-trial is denied. Any other result would unfairly prejudice Bank One because it did not receive notice of such claim or have any opportunity to: (1) build legal defenses to these claims in pre-trial discovery; (2) attack these claims in its pre-trial briefs; and (3) call witnesses to rebut these claims and cross-examine Trustee's witnesses on these claims during trial.

The Trustee has not even asked for leave to amend the Complaint to add the Alleged Interference Claims. While leave to amend shall be freely given when justice so requires under Fed.R.Civ.P. 15(a), leave is inappropriate where there is undue delay, bad faith, dilatory motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, or futility of the amendment. *Villa v. City of Chicago*, 924 F.2d 629, 632 (7th Cir.1991); *Chavez v. Illinois State Police*, 251 F.3d 612, 633 (7th Cir.2001). At any event, such leave was not even requested.

As is the case here, "[u]ndue prejudice occurs when the amendment 'brings entirely new and separate claims'...." *In re Ameritech Corp. v. Computer Systems Solutions, Inc.*, 188 F.R.D. 280, 283 (N.D.Ill. 1999). The Trustee's attempt to add the Alleged Interference Claims by final argument must not be allowed. Indeed, there is some doubt whether attempt to amend the Complaint at this time should be allowed if it were sought because the Trustee had sufficient time prior to the filing of his Final Proposed Findings of Fact and Conclusions of Law to assert these claims. *See Jones v. GES Exposition Servs., Inc.*, No. 02–6243, 2004 WL 2011396, at *6 (N.D.Ill. Sept. 7, 2004) (denying motion to amend because plaintiff's filings showed that he knew of the grounds for claims against the new proposed defendants for years, but needlessly waited). Moreover, the Trustee's tardy attempt to argue the Alleged Interference Claims after trial prejudices Bank One's ability to defend against or argue this issue. *Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1379–80 (7th Cir.1990) (denying post-trial attempt to add defenses to Answer).

Trustee's argument is not saved by our Circuit authority on the meaning of federal notice pleading. The Federal Rules of Civil Procedure are based on the concept of notice pleading. *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1057 (7th Cir.1998). Under this concept, "[i]t is sufficient if the complaint adequately notifies the defendants of the nature of the cause of action." *Id.* In this case, the Trustee did not give notice that a cause of action in tort was presented or intended in his First Amended Complaint or his pre-trial proposed Findings of Fact and Conclusions of Law. There was no notice at all that the Trustee intended to assert a cause of action in tort until his post-trial Findings of Fact and Conclusions of Law. Notice of that sort following trial for the first time does not satisfy federal notice pleading standards.

## VI. Damage Analysis

### A. The Appropriate Amount Of Damages Awarded In Favor Of Trustee And Against Bank One

Trustee's recovery of damages for stay violation, for violation under U.C.C. § 9–207 and under 11 U.S.C. 549 all implicate and caused the same damages.

In this case, the Trustee proposes several possible theories for which damages may be recovered. He argues that acts by Bank One damaged Goss by the following: (1) preventing Goss from receiving $2,700,000.00 from the settlement between Goss and Grupo Serla, including preventing Goss from collecting $1,800,000.00 in two checks endorsed by Grupo Serla to Goss pursuant to that settlement; (2) preventing Goss from enforcing its security interest through the Mexican Pledge Proceedings; and (3) preventing Goss from receiving $5,000,000.00 withheld in connection with the re-sale of the Printing Press to Quebecor. The Trustee therefore seeks a money judgment against Bank One for all these computations of damages plus punitive damages and fees.

In general, "[a] 'plaintiff has the burden of proving damages to a reasonable degree of certainty.'" *Haslund v. Simon Property Group, Inc.*, 378 F.3d 653, 658 (7th Cir.2004) (quoting *Williams v.*

598

*Board of Education,* 52 Ill.App.3d 328, 10 Ill.Dec. 161, 367 N.E.2d 549, 553 (1977)). "Damages must be proved, and not just dreamed, though 'some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer.'" *MindGames, Inc. v. Western Pub. Co., Inc.,* 218 F.3d 652, 658 (7th Cir.2000) (citations omitted).

 Damages cannot be based on pure speculation or guesswork, but they also need not be proven with the certainty of calculus. *BE & K Const. Co. v. Will & Grundy Counties Bldg. Trades Council,* 156 F.3d 756, 770 (7th Cir.1998). Under Illinois law, where the existence of damages is established, "the evidence need only tend to show a basis for the computation of damages with a fair degree of probability." *Medcom Holding Co. v. Baxter Travenol Laboratories, Inc.,* 106 F.3d 1388, 1398 (7th Cir.1997) (citing *In re Busse,* 124 Ill.App.3d 433, 438–39, 79 Ill. Dec. 747, 464 N.E.2d 651 (1984)).

 The possible theories for which damages may be recovered will be discussed below:

1. **Damages resulting from preventing Goss from receiving $2,700,000.00 from the settlement between Goss and Grupo Serla, including preventing Goss from collecting $1,800,000.00 in checks endorsed by Grupo Serla to Goss pursuant to that settlement.**

On or about June 25, 2001 Guarneros came to Chicago and executed a handwritten summary of terms for agreement with Goss ("Agreement in Principal [sic]") on behalf of his company, Grupo Serla. (Pl. Ex. 25.) The Agreement in Principal [sic] provided that "Goss will release any security interest, or retention of title or pledge upon full payment ..." *Id.* Pursuant to the

Agreement in Principal [sic] Guarneros agreed to pay Goss $2,700,000.00. Guarneros testified that it was his intent to pay Goss 100% of those funds. (S.Guarneros, 10/05/05, Test. 89.) Evidence further suggests that Guarneros intended to cooperate and agree to the terms in the Agreement in Principal [sic], as Guarneros authorized Quebecor to issue two checks totaling $1,800,000.00 payable to Grupo Serla and endorsed by Grupo Serla in favor of Goss. (Pl.Ex. 57; S. Guarneros, 10/05/05, Test. 89.)

Goss, however, could not satisfy its obligations under the Agreement in Principal [sic] until it acquired the Grupo Serla Note. Goss could only obtain possession and ownership of the Grupo Serla Note upon paying Bank One $1,425,495.12, plus accrued interest. Once Goss paid Bank One the requisite amount due, it would have the ability to implement the Agreement in Principal [sic]. (Pl.Ex. 57.)

Bank One argues that the Foreign Defendants did not intend to be bound by the handwritten settlement agreement. However, even though that agreement could be said to require a more detailed documentation, Guarneros testified that he intended to pay Goss $2,700,000.00 and was able to do so. Further, checks totaling $1,800,000.00 endorsed to Goss were en route to Goss. By paying Bank One the outstanding balance, Goss would have been able to fulfill its obligations under the Agreement in Principal [sic]. That is, out of the $1,800,000 it could have paid off the Bank the approximately $1,500,000 due it and then still retained $300,000 and the right to the rest of the promised $2,700,000 (amounting to another $900,000) for a net recovery of $1,200,000.

Bank One's actions prevented Goss from recovering any settlement proceeds. Instead, Goss lost the opportunity to participate in a tripartite transaction consisting

of itself, Bank One, and Grupo Serla which would have allowed it to realize net proceeds of $1,200,000 after paying off the Bank debt from the settlement. Bank One's actions blocked and presented that likely outcome.

The $1,200,000 thereby lost by Goss comprises damages that can be measured with reasonable certainty, plus attorneys fees and costs. A separate evidentiary hearing will be set to rule on the amount of attorney fees sought by the Trustee. This computation of $1,200,000 in damages applies to fix damages both for willful stay violation and also to measure damages for the U.C.C. § 9–207 violation by Bank One earlier discussed and for the unauthorized transfer of property interests under 11 U.S.C. § 549.[4]

## 2. Damages Asserted to Result from Preventing Goss from Enforcing its Security Interest Through the Mexican Pledge Proceedings.

The Trustee argues that Bank One's actions prevented Goss from enforcing its security interest in the Mexican Pledge Proceedings. The Mexican court Judge in the Pledge Proceedings dismissed the case because Goss was unable to produce the original Grupo Serla Note. Goss, however, had no right to possess the Grupo Serla Note. Bank One owned the Grupo Serla Note and was not required to turn the Grupo Serla Note over to Goss until it was paid in full. Bank One possessed the Grupo Serla Note as a form of security, and it would make no commercial sense to have given the Grupo Serla Note to Goss in the absence of full payment of its obligations. Only if Goss had paid Bank One the full amount due and owing under the Grupo Serla Note, it would have had the opportunity to enforce it in the Mexican proceedings.

Apart from the lack of evidence or authority to suggest that Bank One had to provide Goss with the original Grupo Serla Note, evidence suggests that Bank One did cooperate with Goss in the state court litigation as Bank One and Goss filed a joint complaint against the Foreign Defendants. (Pl.Ex. 15.)

At any event, this path toward ascertaining damages is far too speculative.

## 3. Damages Asserted to result from preventing Goss from receiving $5,000,000.00 held back in connection with the resale of the Printing Press to Quebecor.

The Trustee argues that Bank One's willful violation of the automatic stay prevented Goss from receiving $5,000,000.00 withheld by Quebecor in connection with the asset sale to Grupo Serla.

Bank One argues that the Trustee failed to offer proof as to the reason Quebecor ultimately decided to release the funds to Grupo Serla. However, the letter written by Kaplan of Bank One demonstrates why Quebecor ultimately decided not to release the funds to Goss-that is, Bank One had sold the Grupo Serla Note to Union Industrial.

On or about December 20, 2001 Kaplan wrote a "To Whom It May Concern" letter

---

4. It could be reasoned since the Bank's claim is apparently unsecured that it would not receive the balance needed to redeem the Note but rather would be relegated to the small result of its unsecured claim in bankruptcy. That is apparently what its internal analysis apprehended. However, since Bank One owned the Note subject to Debtor's interests therein, it would be no simple matter for Debtor to obtain it so as to receive the $2.7 million being offered; litigation to force the Bank to turn it over without payment would be problematic. So the Bank held a likely blocking position unless it was first paid and Debtor's recovery of the full $2.7 million was speculative. Only a three way deal would have produced a certain recovery of the $1.2 million for Debtor; recovery of the full $2.7 million was most unlikely and does not offer a solid basis for damages in that amount.

addressed to Union Industrial stating that Bank One had sold its promissory note from Goss to Union Industrial and that the only remaining issue was the receipt of an execution copy of the note purchase agreement. (Pl.Ex. 107.) Bank One knew that in order to complete the sale with Quebecor, Grupo Serla would need the Printing Press to be free and clear of all liens. Bank One therefore negotiated the sale with Union Industrial whereby it received $1,100,000. Bank One then wrote the above "To Whom It May Concern" letter in which it acknowledged that it had sold the Grupo Serla Note to Union Industrial. Union Industrial could then forward this letter to Quebecor as evidence that the Printing Press was now free and clear of all liens and the sale could thus be consummated. The only party that did not benefit from this scheme and procedure was Goss.

However, Goss did not have possession of the Grupo Serla Note and as such, could not have released it to Quebecor. Quebecor did not enter into any agreement with Goss to pay Goss for the Printing Press. Goss could not expect any funds from Quebecor because it was not in possession of the Grupo Serla Note and did not have the cash needed to redeem the Note. Therefore, this path to computation of damages is speculative. Thus, the Trustee is not entitled to damages based on this theory.

### B. *Punitive Damages Are Appropriate*

In determining whether an award of punitive damages is appropriate for a creditor's violation of the automatic stay, the following relevant factors may be considered: (1) the nature of the creditor's conduct; (2) the creditor's ability to pay damages; (3) the motive of the creditor; and (4) any provocation by the debtor. *In re Sumpter*, 171 B.R. 835, 845 (Bankr.

N.D.Ill.1994). "Punitive damages are awarded in response to particularly egregious conduct for both punitive and deterrent purposes." *Id.*

It is beyond dispute that awarding punitive damages is appropriate in certain cases to punish a wrongdoer for outrageous conduct and to deter others from engaging in similar conduct. *Hennessy v. Penril Datacomm Networks, Inc.*, 69 F.3d 1344, 1352 (7th Cir.1995). "An award of punitive damages, however, must be supported by the record and may not constitute a windfall to the prevailing party." *Id.* (citations omitted).

It should be presumed that because a plaintiff has been made whole by compensatory damages, punitive damages should only be awarded if the actions of the defendant are so reprehensible to warrant further sanctions to achieve punishment or deterrence. *State Farm v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) (noting that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.").

Under Illinois law, punitive damages are disfavored. *Zelinski v. Columbia*, 335 F.3d 633, 641 (7th Cir.2003) (citing *Smith v. Prime Cable of Chicago*, 276 Ill. App.3d 843, 213 Ill.Dec. 304, 658 N.E.2d 1325, 1336 (1995)). They are therefore only recoverable "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Id.*

Based on the above factors and precedent, punitive damages are appropriate in this case. Bank One's conduct was particularly egregious in light of the circumstances, Bank One is a sophisticated creditor with the ability to pay damages,

Bank One was motivated by the opportunity to gain $1,100,000 as opposed to having its claim dealt with in Goss' bankruptcy, and Bank One acted with indifference to the harm it was causing to Goss in bankruptcy.

Bank One's actions in executing the sale to Union Industrial were deliberate and intentional. It was fully aware that it was selling and delivering the Grupo Serla Note and Pledge to an entity connected to the makers. The law firm representing Union Industrial in connection with the sale was the same law firm representing Guarneros and His Companies in the DuPage Litigation and otherwise. Bank One admitted at trial that the initial offer to purchase the Grupo Serla Note and Pledge was made on behalf of the makers of the Grupo Serla Note themselves. (M.Page, 9/30/05, Test. 63–64.) Thus, Bank One knew the harm it was doing to Goss and it harmed Goss' property interest that was part of the bankruptcy estate in complete disregard of the bankruptcy stay. Sophisticated commercial entities cannot be allowed to disregard the stay and grab a slice of benefit that would otherwise go to bankruptcy creditors. This type of conduct must be deterred by a serious award in addition to damages.

Therefore, the judgments entered in favor of Trustee and against Bank One will include punitive damages in the amount of $100,000.00, an amount large enough to demonstrate the serious nature of stay violation and deter similar conduct by others.

## VII. *Editorial Comercial Breached The Contract To Sell The Printing Press By Failing To Pay For The Printing Press*

### A. *Summons Served On Foreign Defendants*

■ On December 31, 2003 the Foreign Defendants moved to Quash Summonses and to Dismiss Pursuant to Bankruptcy Rule 7012(b) ("Motion to Quash"). They argued that the Trustee's attempt to serve them by registered mail was insufficient under Fed.R.Civ.P. 4 and Article 10(a) of the Hague Convention. *See* Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Feb. 10, 1969, 20 U.S.T. 361, 658 U.N.T.S. 163. They also argued that the exercise of jurisdiction over certain of the Foreign Defendants was inconsistent with constitutional guarantees of due process.

On May 18, 2004, an Order was entered denying the Motion to Quash for reasons then stated from the bench. That decision was based on a Seventh Circuit opinion, *Research Systems Corp. v. IPSOS Publicite,* 276 F.3d 914 (7th Cir.2002). In *Research Systems Corp.* it was opined that the manner of service by simple certified mail is a method permitted by Article 10(a) of the Hague Convention, so long as the foreign country does not object. *Id.* at 926. In this case, the parties agreed that the Mexican government has never indicated any objection to service on its citizens by mail from a foreign country. Under that decision, *stare decisis* in this Circuit holds that service by registered mail is sufficient. Further, service by mail has long been held to meet due process requirements. *See* Fed.R.Civ.P. 5(b)(2)(B); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 319, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (noting that "the mails today are recognized as an efficient and inexpensive means of communication.").

### B. *Merits Of Contract Breach Actions*

Grupo Serla, Editorial Comercial, and Guarneros all executed or guaranteed the

Grupo Serla Note to obtain the Printing Press. They failed to pay for the Printing Press as required and now must pay damages to Goss.

 To properly prove a cause of action in breach of contract, a plaintiff must establish the following essential elements: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resultant injury to the plaintiff. *Gallagher Corp. v. Russ*, 309 Ill. App.3d 192, 199, 721 N.E.2d 605, 611, 242 Ill.Dec. 326, 332 (1999) (citing *Allstate Insurance Co. v. Winnebago County Fair Association Inc.*, 131 Ill.App.3d 225, 233, 86 Ill.Dec. 233, 475 N.E.2d 230 (1985)).

 A defendant's failure to comply with a duty imposed by the contract gives rise to the breach. *Hickox v. Bell*, 195 Ill.App.3d 976, 992, 142 Ill.Dec. 392, 552 N.E.2d 1133 (1990). In a breach of contract action, a plaintiff should prove the factual circumstances surrounding formation of the agreement, specifically, the offer, acceptance and existence of valuable consideration. *Gallagher Corp.*, 309 Ill. App.3d at 199, 242 Ill.Dec. 326, 721 N.E.2d 605.

In this case, Editorial Comercial agreed to purchase the Printing Press pursuant to the Contract To Purchase The Press. Goss delivered the Printing Press pursuant to the Contract To Purchase The Press. Grupo Serla and Editorial Comercial executed a Promissory Note for the financed portion of the purchase price. Guarneros personally guaranteed the Promissory Note. Editorial Comercial, Grupo Serla, and Guarneros failed to pay as required. Guarneros and His Companies then sold the Printing Press to a third party and kept the proceeds. Goss suffered significant damages as a result of the Foreign Defendants breach of contract through nonpayment.

The Foreign Defendants argued that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and Goss' pre-sale representations. However, they failed to offer expert testimony or detailed evidence to corroborate this assertion by preponderance of evidence.

Editorial Comercial also attempted to argue that the Printing Press was never accepted. However, testimony of Guarneros demonstrates that the Printing Press was used for several years. Guarneros testified as follows:

Q: At some time the Goss Universal produced commercially acceptable product, did it not?

A: Acceptable in reference to what? Directories? Magazines? Books?

Q: At least one of those, correct?

A: Yes. Very poor quality, but, yes.

(S.Guarneros, 10/5/05, Test. 44–45.)

Editorial Comercial's defense that it never accepted the Printing Press fails. The Contract To Sell The Press defines acceptance. Paragraph four of the Contract To Sell The Press states:

4. *Conformity—Acceptance Of Machinery*

a) Conformity shall mean substantial conformity of the Machinery in all material respects to the applicable descriptions, specifications and warranties of sale. Conformity shall be conclusively determined upon the occurrence of any one of the following events:

(i) Purchaser's production of saleable, commercially acceptable product in the ordinary course, subject to the printing limitations imposed on the type of printed product, supplies or

auxiliary equipment, or Purchaser's operating personnel . . .

(Pl.Ex. 2; ST 1055.)

Guarneros testified that he took no steps to return the Printing Press. Guarneros admitted at trial that he did not request that Goss take back the Printing Press. While Guarneros attempted to argue that the Printing Press was never accepted because it was defective and did not perform as specified, it was ultimately sold as the largest single asset of the $13,000,000.00 asset sale to Quebecor, demonstrating its continued market value.

The Uniform Commercial Code also defines acceptance. U.C.C. § 2–606 provides that acceptance occurs when the buyer:

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their non-conformity; or

(b) fails to make an effective rejection (subsection (1) of Section 2–602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.

*See* 810 Ill.Comp. Stat. 5/2–606 (2004).

In this case, Guarneros and His Companies used the Printing Press for four years. This allowed them ample time to inspect and reject the Printing Press prior to actually selling the same to Quebecor as the largest part of a $13,000,000 asset sale. The Printing Press was the highest valued single asset Quebecor purchased in the sale. (Pl.Ex. 23, ST 257.) These facts demonstrate that Editorial Comercial accepted the Printing Press. The Foreign Defendants claimed that the Printing Press did not deliver 45,000 impressions per hour as promised in the Purchase and Sale Agreement and based on Goss' pre-sale representations. However, the evidence and facts presented at trial demonstrate that the Printing Press was used to produce commercially acceptable products with nine or ten workers using the Printing Press for several shifts a day over a period of several years.

 When a buyer has used the goods provided by the seller, he cannot thereafter claim that he has not accepted them. *Sherwin–Williams Co. v. Mark Charcoal Co., Inc.*, No. 80 C 4541, 1985 WL 3932, at *3 (N.D.Ill. Nov.15, 1985). "The law does not permit a person to receive goods under a contract, appropriate them for his own use, and then defeat an action for the purchase price on the ground that the goods were not of the exact quality or description called for by the contract." *Foley & Co. v. Excelsior Stove & Manufacturing Co.*, 265 Ill.App. 78, 94 (1932).

 Under Illinois law, Guarneros and His Companies cannot assert that they never accepted the Printing Press when they clearly exercised ownership over it and used it extensively for many years following purchase. *See, Foley & Co. v. Excelsior Stove & Manuf. Co.*, 265 Ill. App. 78, 94 (1932) (use of 8,000 catalogs of 25,000 printed constitutes acceptance of all of them); *Sherwin–Williams Co. v. Mark Charcoal Co., Inc.*, 1985 U.S. Dist. Lexis 13846, 1985 WL 3932 (N.D.Ill.1985) (holding that a buyer cannot revoke acceptance if it exercises dominion over the goods or permits them to be altered or changed while in its control). Pursuant to its contractual obligations to Goss, Editorial Comercial must now pay Goss for the Printing Press.

In connection with the Sale and Purchase Agreement, Editorial Comercial and

Grupo Serla executed a Promissory Note in the amount of $5,370,000.00. Guarneros personally guaranteed the debt and signed the Promissory Note as Guarantor. Guarneros and His Companies failed to pay Goss as agreed. There remains $9,724,858.50 due and owing pursuant to the Promissory Note including interest on the Note through commencement of time, plus interest accruing to date of judgment. As a result, a separate judgment will enter in favor of Plaintiff against Guarneros and His Companies jointly and severally for principal and interest due plus attorneys fees allowed by the contract papers when enforcement is required, plus costs.

The Sale and Purchase Agreement provided:

Upon an Event of Default, Seller shall provide Purchaser with written notice thereof and an opportunity to cure within a reasonable time determined by Seller and specified in such notice. Upon the failure of Purchaser to cure in accordance with Seller's demand and upon written demand by Seller, the Purchaser shall peaceably deliver possession of the Machinery to Seller, and, to the extent permitted by law, the entire contract indebtedness remaining unpaid shall become immediately due and payable. Purchaser shall reimburse Seller for its reasonable expenses incurred in the retaking, holding, preparing the Machinery for resale and the expenses relating to reselling and the like, and for the reasonable attorneys' fees and legal expenses incurred by the Seller. In addition, Seller shall have all the rights and remedies of a seller and a secured party as established or permitted upon agreement by the Uniform Commercial Code which rights and remedies, to the extent permitted by law, shall be cumulative.

(Pl.Ex. 2, ST 1057.)

Editorial Comercial, Grupo Serla, and Guarneros failed to pay Goss amounts due under the Grupo Serla Note and the Sale and Purchase Agreement. Editorial Comercial was obligated to make payments to Goss under the Grupo Serla Note and the Sale and Purchase Agreement. Grupo Serla and Guarneros were obligated to make payments to Goss pursuant to the Grupo Serla Note. Written demand was made for payment, but not complied with.

A separate judgment will therefore enter in favor of Trustee and against Editorial Comercial, Grupo Serla, and Guarneros jointly and severally for the balance due and owing on the Grupo Serla Note plus interest accruing thereon until this trial began for a total then of $9,724,858.50 plus further contract interest to date of judgment, plus attorney fees and costs as provided for in the Sale and Purchase Agreement quoted above. A separate evidentiary hearing will be held on the amount of Trustee's attorney fees to be awarded against these Defendants apart from attorneys fees sought against the other Defendant Bank One.

### CONCLUSIONS

For reasons stated herein, Judgments will separately be entered as follows on the Trustee's First Amended Complaint:

Counts I, II, and III address Editorial Comercial, Grupo Serla, and Guarneros' failure to make payments to Goss pursuant to the Sale and Purchase Agreement, the Grupo Serla Note, and Guarneros' personal guaranty of the Grupo Serla Note. Trustee will recover judgment against those parties as provided above on those counts, for damages plus fees and costs.

Count IV seeks a declaratory judgment which will be denied for reasons stated.

Count V seeks imposition of a constructive trust and other relief against all De-

fendants which will be denied pursuant to reasons stated.

Count VI seeks rescission of the December 15, 2000 Agreement which will be denied pursuant to reasons stated.

Judgment will therefore be entered on Counts IV, V and VI in favor of Defendants.

Count VII seeks recovery declaring that transfer of the Note by Bank One was void, pursuant to 11 U.S.C. § 549, but while the Note transfer was not void the transfer of Goss interests in the Note is void and damages of $1,200,000 will be awarded. The same damages are awarded because Bank One violates its duty to Goss under U.S.C. § 9–207 as adopted in Illinois.

Count VIII seeks recovery against Bank One in the form of damages based on Bank One's willful violation of the automatic stay. Pursuant to Bank One's willful violation of the automatic stay and for reasons stated, judgment will separately enter in favor of Trustee and against Bank One for $1,200,000 in actual damages, plus $100,000.00 in punitive damages, plus attorney fees and costs. The amount of fees to be awarded (allocated separate from fees awarded against the Foreign Defendants) will be determined by this Court at a later evidentiary hearing.

Pursuant to these Findings of Fact and Conclusions of Law, and separate order this date, this case is set for status to consider Trustee's requests for attorneys fees and proposed draft judgment orders against Foreign Defendants under Counts I, II, and III, for judgment in favor of Defendants under Counts IV, V, and VI, and for judgment order against Bank One under Counts VII and VIII and to consider requests for fees against it.

All costs will be sought by Bills of Costs separately allocated between the Mexican Defendants and Bank One and noticed before the Court for approval and allowance.